1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
TACOMA DIVISION

8

9
10
11
12

COLUMBIA RIVERKEEPER, SIERRA
CLUB, CENTER FOR BIOLOGICAL
DIVERSITY, WASHINGTON
ENVIRONMENTAL COUNCIL, and
WASHINGTON PHYSICIANS FOR
SOCIAL RESPONSIBILITY,

Plaintiffs,

v.

UNITED STATES ARMY CORPS OF
ENGINEERS, and NATIONAL MARINE
FISHERIES SERVICE,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Cause No. _____

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

13
14
15
16
17
18
19
20

INTRODUCTION

21

1.      Northwest Innovation Works ("NWIW"), a corporation majority owned by the

22  Chinese government, seeks to build a methanol manufacturing and shipping terminal on the

23  banks of the Columbia River in Kalama, Washington (the "Kalama Project").  The Kalama

24  Project involves building a refinery to convert fracked gas (which consists primarily of methane)

25  to methanol, a marine export terminal to load methanol onto ships bound for China, and a short

26
27
28

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

- 1 -

gas pipeline to supply the refinery with fracked gas.  With further processing, methanol can be turned into olefins, which is then used to make plastic.  Methanol can also be used as a fuel. NWIW would use fracked gas to both power its refinery and to chemically create methanol. Each step on the journey releases greenhouse gases, including methane, which has at least four times the climate impact as carbon dioxide.

2.     The Kalama Project will have significant harmful environmental impacts.  The refinery would be among the largest methanol refineries in the world and would be one of the largest gas users in the State of Washington.  The refinery would use between 270,000 and 320,000 dekatherms of fracked gas every day for methanol production and as fuel for an on-site gas-fired electric generating unit, which is more gas than all the power plants in the state combined, and more than all residential uses combined.  The refinery alone would emit more than 1,000,000 tons of greenhouse gases per year and would increase the state's greenhouse gas emissions by 1 percent, while at the same time Washington strives to reduce such emissions to combat the current climate crisis.

3.     The Kalama Project needs a variety of federal, state, and local permits and approvals to move forward.  Prior to the initial issuance of Washington state and local permits, Cowlitz County and the Port of Kalama prepared a state environmental impact statement ("EIS"), pursuant to the State Environmental Policy Act, to review and analyze environmental harms caused by the Kalama Project.  Successful 2017 litigation over Washington shoreline permits and the final state EIS required NWIW to undertake a supplemental environmental analysis specifically focused on greenhouse gas emissions and climate change.

4.     Plaintiffs Columbia Riverkeeper, Center for Biological Diversity, Sierra Club, Washington Environmental Council, and Washington Physicians for Social Responsibility

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

- 2 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

(collectively "Riverkeeper") challenge the U.S. Army Corps of Engineers ("Corps") issuance of a Clean Water Act ("CWA") § 404 permit (NWP-2014-177/2) to build the marine terminal, as well as the truncated National Environmental Policy Act ("NEPA") review underlying that permit approval.

5.     Under NEPA, the Corps failed to fully consider the significant and harmful greenhouse gas impacts of the Kalama Project in a complete and transparent EIS.  Instead, the Corps completed a limited Environmental Assessment ("EA") and made a Finding of No Significant Impact ("FONSI") for the issuance of the CWA permits.

6.     The inadequate EA, FONSI, and decision not to prepare a comprehensive federal EIS are the result of the Corps' failure to take the legally required "hard look" at all direct, indirect, and cumulative impacts of the agency's decision to allow the refinery, export terminal, and pipeline to be built and operated.  The Corps' review is arbitrary, capricious, and contrary to NEPA and its implementing regulations.

7.     The Corps' EA also relies on a displacement theory with unsupported assumptions about the extent to which methanol-to-olefin production in Kalama will displace coal-to-olefin production in China, further undermining its conclusions about total greenhouse gas impacts caused by the Kalama Project.

8.     The inadequacies in the environmental review underscore the Corps' errors in issuing the CWA § 404 permit.  Specifically, the Corps prepared an inadequate public interest determination in violation of Section 404 of the CWA and Section 10 of the Rivers and Harbors Act.

9.     In balancing the public interest, the EA improperly excluded consideration of the refinery's detrimental greenhouse gas impacts from the public interest review, even though it

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

- 3 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

applied the refinery's alleged benefits to the public interest review.  The EA ignored greenhouse gas emissions from the marine export terminal and fracked gas feeder pipeline without explanation or analysis, relying only on the invalidated state EIS to treat those impacts as de minimis.  The EA also failed to appropriately consider other important public interest factors, including the Kalama Project's declining profitability, nearby property value losses, and diminished aesthetics.

10.     Plaintiffs also challenge the failure of the National Marine Fisheries Service's ("NMFS") Biological Opinion ("BiOp") on the Kalama Project to set meaningful and required limits on incidental take of threatened and endangered species, including salmon, Southern Resident killer whales, and leatherback sea turtles.

11.     Plaintiffs ask the Court to (1) vacate the EA/FONSI, CWA section 404 permit, and NMFS biological opinion and its accompanying Incidental Take Statement; (2) remand to the Corps to prepare an environmental impact statement on the Proposed Project before reconsidering a new CWA section 404 permit; and (3) remand to the Corps and NMFS to complete consultation on the Proposed Project.

## JURISDICTION AND VENUE

12.     This case is brought under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A).  Jurisdiction arises under 28 U.S.C. § 1331 (federal question jurisdiction); § 2201 (declaratory relief); § 2202 (injunctive relief).

13.     Venue in this district is appropriate under 28 U.S.C. § 1391(e), because the Kalama Project would be located in this district, two plaintiff groups reside in this district, and many of the events and the consequences of the defendants' violations of law occurred or will occur in this district.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

PARTIES

14.    The plaintiffs in this action are:

A.    <u>Columbia Riverkeeper,</u> a 501(c)(3) non-profit corporation registered in the State of Washington.  Columbia Riverkeeper's mission is to restore and protect the water quality of the Columbia River and all life connected to it, from the headwaters to the Pacific Ocean.  To achieve these objectives, it operates scientific, educational, and legal programs aimed at protecting water quality, air quality, public health, climate stability, and habitat in the Columbia River Basin.  It has over 16,000 members and supporters, many of whom reside in the area that would be affected by the Kalama Methanol Project.  Columbia Riverkeeper was one of the petitioners in Washington state litigation over the original state final EIS and is currently a petitioner in a state-level challenge to the supplemental EIS for the Kalama Project.  Riverkeeper and/or its members have submitted comments or correspondence on the Kalama Project to the Army Corps of Engineers, the National Marine Fisheries Service, the Federal Energy Regulatory Commission, the U.S. Department of Energy's Loan Program Office, the U.S. Department of Transportation's BUILD Grant and Port Infrastructure Development Grant programs, the Committee on Foreign Investment in the United States, the Washington legislature, Governor Inslee's office, the Washington Department of Ecology, the Washington Energy Facility Site Evaluation Commission, the Washington Utilities and Transportation Commission, the Washington State Investment Board, the Southwest Clean Air Agency, Cowlitz County, the Port of Kalama, and the City of Kalama.

B.    <u>Center for Biological Diversity</u>, a national, non-profit conservation organization with offices throughout the United States.  Its mission is to secure a future for all endangered species and wild places through science, law, and creative media, with a focus on protecting the

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

- 5 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

lands, waters, and climate that species need to survive.  The Center has more than 70,000 members and supporters who care about protecting the natural environment from the ravages of climate change and other environmental degradation, including approximately 3,500 members in Washington State.  The Center was one of the petitioners in Washington state litigation over the original state final EIS, and is currently a petitioner in a state-level challenge to the supplemental EIS for the Kalama Project.  The Center and its members have submitted comments on the Kalama Project to the Army Corps of Engineers, the National Marine Fisheries Service, the Federal Energy Regulatory Commission, the U.S. Department of Energy's Loan Program Office, and the U.S. Department of Transportation's BUILD Grant and Port Infrastructure Development Grant programs.  The Center has advocated for protections for species that rely on the Columbia River, including salmon, Southern Resident killer whales, and leatherback sea turtles by raising public awareness, submitting scientific petitions, and filing lawsuits.  Specifically, the Center has petitioned to: list the Southern Resident killer whale under the Endangered Species Act ("ESA") and successfully challenged the agency's initial "not warranted" finding; to expand the Southern Resident's critical habitat to cover ocean foraging grounds down the West Coast, off the coasts of Washington, Oregon, and California; to establish critical habitat for leatherback sea turtles on the U.S. West Coast; and to list the Oregon coast spring-run chinook under the ESA.

C.    Sierra Club, one of the oldest environmental organizations in the United States. Sierra Club is incorporated in the State of California as a Nonprofit Public Benefit Corporation with headquarters in Oakland, California.  The organization has over 775,200 members, including 31,040 members in Washington State.  Sierra Club is dedicated to protecting and preserving the natural and human environment, and its purpose is to explore, enjoy, and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

- 6 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7310*

and resources; and to educate and enlist humanity to protect and restore the quality of the natural and human environments.  In support of this mission, Sierra Club has taken extensive actions on climate change, including participating in state and federal rulemaking, opposing further build-out of fossil fuel infrastructure, and working to reduce greenhouse gas emissions from existing facilities.  Sierra Club was one of the petitioners in Washington state litigation over the original state final EIS, and is currently a petitioner in a state-level challenge to the supplemental EIS for the Kalama Project.  Sierra Club and its members have submitted comments on the Kalama Project to the Port of Kalama, Cowlitz County, Washington Department of Ecology, and U.S. Department of Transportation.

D.    Washington Environmental Council, ("WEC") is a statewide nonprofit organized under the laws of the State of Washington with a mission to protect, restore, and sustain Washington's environment for all, and achieving clean water is a primary goal of its current strategic plan.  It is headquartered in Seattle and has over 35,000 members and supporters in Washington State.  WEC's work finds solutions to address climate change and promote clean energy; protects and restores Puget Sound; protects forest ecosystems through incentives and other tools; and stops new fossil fuel infrastructure.  WEC works in partnership with the Power Past Fracked Gas campaign, Stand Up to Oil campaign, Environmental Priorities Coalition, and the Alliance for Jobs and Clean Energy.  WEC is a petitioner in a state-level challenge to the supplemental EIS for the Kalama Project.  Washington Environmental Council and its members have submitted comments on the Kalama Project to Port of Kalama, Cowlitz County, and the Washington Department of Ecology.

E.    Washington Physicians for Social Responsibility, ("WPSR") is the Washington State chapter of Physicians for Social Responsibility, a 40-year-old physician-led advocacy

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

organization working to create a healthy, just, peaceful and sustainable world.  WPSR takes on the gravest current threats to human health and survival, including a climate crisis driven by dependence on fossil fuels.  WPSR leverages the credible and trusted voice of healthcare professionals to educate the public, influence decisionmakers, and promote public policies that support its mission.  WPSR is deeply concerned about the impact of the proposed Kalama methanol facility on the health and wellbeing of people and the environment, both of which will be adversely affected by the danger and pollution that this proposed project will bring to the fragile region, and particularly to those in proximity to the project.

15.    Plaintiffs are conservation organizations that represent thousands of members and supporters working to protect and restore Washington's environment and the Columbia River. Plaintiffs' members work, live, and recreate in and along the Columbia River and the surrounding landscape near Kalama.  Plaintiffs and their members are deeply concerned by plans to construct the Kalama Project in and along the Columbia River.  The Kalama Project would undermine local and regional efforts to protect water quality, recover endangered and threatened species, support vibrant fishing communities, protect human health and safety, transition to a low-carbon economy, and combat climate change.  The plaintiffs and their members derive scientific, recreational, aesthetic, and conservation benefits from the waters of the Columbia River and the surrounding areas for fishing, rafting, hiking, walking, windsurfing, photographing, boating, and observing wildlife.  The past, present, and future enjoyment of these benefits by plaintiffs and their members has been, is being, and will continue to be irreparably harmed by defendants' disregard of their statutory duties and by the Kalama Project's significant environmental impacts.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

- 8 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

16.     The defendants in this action are:

A.      <u>U.S. Army Corps of Engineers</u>, an agency within the executive branch of the federal government.  The Corps is the lead agency for permitting the discharge of dredged or fill material into navigable waters of the United States under CWA § 404.

B.      <u>National Marine Fisheries Service</u>, an agency of the United States Department of Commerce, with delegated authority to administer the ESA with regard to threatened and endangered marine species and anadromous fish species.

LEGAL BACKGROUND

I.      NATIONAL ENVIRONMENTAL POLICY ACT

17.     NEPA, 42 U.S.C. §§ 4321–4370f, is our "basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a).  NEPA makes environmental protection a part of the mandate of every federal agency.  42 U.S.C. § 4332(1).  It requires federal agencies to take environmental considerations into account in their decisionmaking "to the fullest extent possible."  42 U.S.C. § 4332; 40 C.F.R. § 1500.2.

18.     The cornerstone of NEPA's protections is the environmental impact statement.  NEPA requires federal agencies to prepare an EIS before undertaking any "major federal action significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  The EIS requires a detailed, "hard look" at the environmental impact of—and alternatives to—the proposed action.  *Id*.  The environmental effects that must be considered in an EIS include "indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable," as well as direct effects.  40. C.F.R. § 1508.8.  An EIS must also consider the cumulative impacts of the proposed action, that is, the environmental impacts that result "from the incremental impact of the action when added to other past, present,

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

- 9 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

and reasonably foreseeable future actions." 40 C.F.R. § 1508.7; *see also* § 1508.27(b)(7). The purpose of an EIS is to inform the decision-makers and the public of the significant environmental impacts of the proposed action, means to mitigate those impacts, and reasonable alternatives that will have lesser environmental effects.

19.     NEPA also requires that defendants use high quality, accurate scientific information and ensure the scientific integrity of its analysis. *See* 40 C.F.R. § 1500.1(b); 40 C.F.R. § 1502.24.

20.     An agency may prepare an Environmental Assessment ("EA") to determine whether it must prepare an EIS. 40 C.F.R. §§ 1501.4(c), 1501.3(b). If an agency action will cause "significant" adverse effects, the agency must prepare an EIS. 40 C.F.R. § 1501.4. The agency must prepare a finding of no significant impact if it determines (on the basis of the EA) not to prepare a statement. 40 C.F.R. § 1501.4(e).

21.     Regulations for the Army Corps incorporate these requirements by reference. 33 C.F.R. § 325, App. B.

II.     CLEAN WATER ACT

22.     Congress enacted the Clean Water Act in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To help accomplish this goal, the Clean Water Act prohibits the discharge of any pollutant, including dredged spoil or other fill material, into waters of the United States unless authorized by a permit. *Id.*, § 1311(a). Unless statutorily exempt, all discharges of dredged or fill material into waters of the United States must be authorized under a permit issued by the Corps. *Id.*, §§ 1344(a)–(e).

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

23. The Corps issues individual permits under § 404(a) on a case-by-case basis after taking "all appropriate and practicable steps to avoid and minimize adverse impacts to waters of the United States." *Id.*, § 1344(a); *see also* 40 C.F.R. § 230.91(c)(2). Such permits are issued after a review involving, among other things, site-specific documentation and analysis of waters and wetlands and potential effects to them, public interest analysis, and a formal determination pursuant to the statutory and regulatory criteria. 33 C.F.R. § 322.3, Parts 323, 325.

24. The Environmental Protection Agency's 404(b)(1) Guidelines require the Corps to avoid any adverse impacts to waters of the United States. 40 C.F.R. § 230.91(c)(2). The Corps shall not issue a Section 404 permit "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a). Practicable alternatives include "[a]ctivities which do not involve a discharge of dredged or fill material." *Id.* at § 230.10(a)(1)(i). "An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." *Id.* § 230.10(a)(2).

III. ENDANGERED SPECIES ACT

25. Congress passed the ESA in 1973 in response to the extinction crisis to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species…." 16 U.S.C. § 1531(b). Congress defined "conservation" under the ESA as "the use of all methods and procedures which are necessary to bring any endangered species to the point at which the measures provided pursuant to this act are no longer necessary,"

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

that is, when the species have recovered and no longer need the protection of the ESA.  16 U.S.C. § 1532(3).

26.     In broad strokes, the ESA seeks to protect and recover imperiled species and populations by first listing them as threatened or endangered based on enumerated statutory factors, 16 U.S.C. § 1533(a)(1)(A)-(E).  Later sections of the Act provide for specific protection and recovery procedures and standards for listed species and their designated critical habitat.

27.     Congress charged each and every federal agency with the affirmative duty to further conservation of listed species; the ESA explicitly elevates threatened and endangered species protection over the primary missions of federal agencies.  16 U.S.C. § 1536(a).  Section 7 of the ESA prohibits agency actions that may jeopardize the survival and recovery of listed species or adversely modify designated critical habitat.  16 U.S.C. § 1536(a)(2).

28.     Section 7(a)(2) and its implementing regulations set forth a detailed process that must be followed before agencies take or approve actions that "may affect" threatened or endangered species or critical habitat.  Fulfillment of this process is the only means by which an agency ensures that its affirmative duties under Section 7(a)(2) are satisfied.  In fulfilling the requirements of Section 7(a)(2) and the procedural requirements set forth in 50 C.F.R. Part 400, agencies must "use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

29.     If agency action "may affect" listed species in the action area, the agency must prepare a "biological assessment" that "evaluate[s] the potential effects of the action" on listed species and their habitat. *Id*. §§ 402.02, 402.12.  The biological assessment must include a description of the proposed action, its effects, and the relevant scientific evidence.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
- 12 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

30.     If the action agency concludes in its biological assessment that an action is "not likely to adversely affect" listed species, and the Service concurs with that determination in writing, the action agency typically relies on the biological assessment and concurrence (known as "informal consultation") to satisfy its ESA obligations.  *See id*. § 402.13(a); 402.14(a)-(b).

31.     If an action agency determines in its biological assessment that an action "may affect" and is "likely to adversely affect" listed species or their critical habitat, or if the Service does *not* concur in the action agency's determination in its biological assessment that the action is "*not* likely to adversely affect" listed species or their critical habitat, the action agency must enter into a more extensive consultation process with the Service on the action's threats to listed species and their critical habitat (known as "formal consultation").  *See* 50 C.F.R. §§ 402.14(a)-(b), 402.12(k).  The threshold for triggering this formal consultation requirement is "very low." 51 Fed. Reg. 19,949, 19,949-50 (June 3, 1986).

32.     At the conclusion of a formal consultation, the expert fish and wildlife agency issues a biological opinion assessing the effects of the action on the species and its critical habitat, determining whether the action is likely to jeopardize the continued existence of the species or adversely modify its critical habitat.  16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(g)-(h).

33.     Section 9 of the ESA prohibits "take" of endangered species by any person, which includes federal agencies.  16 U.S.C. § 1538(a)(1).  "Take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect."  16 U.S.C. § 1532(19).  NMFS has defined "harm" to include "significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including breeding, spawning, rearing, migrating, feeding or sheltering."  50 C.F.R. § 222.102.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
- 13 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

34.     If a federal action undergoing consultation will take a listed species, the biological opinion must include an "incidental take statement" ("ITS") that specifies the amount and extent of incidental take of listed species that may occur without causing jeopardy or adverse modification of critical habitat.  16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).  The incidental take statement provides a safe harbor, insulating from take liability activities undertaken in compliance with the incidental take statement's terms and conditions.  16 U.S.C. § 1536(o)(2); see 16 U.S.C. § 1536(b)(4)(C).  An incidental take statement also serves as a check on the biological opinion's assumptions and conclusions and provides for monitoring.  50 C.F.R. § 402.14(i)(3).  It must set out a "trigger" that specifies an unacceptable level of take that invalidates the safe harbor and requires the agencies to immediately reinitiate consultation.  *Id.* § 402.14(i)(4).  The ESA implementing regulations require reinitiation of consultation when the amount of take exceeds that specified in the incidental take statement.  50 C.F.R. § 402.16(a).

## FACTUAL BACKGROUND

## I.     THE KALAMA METHANOL PROJECT

### A.     Proponents, Location, and Project Details

35.     The Kalama Project includes the refinery, marine export terminal, and the pipeline, referred to as the Lateral Project.  The Kalama Project's stated objective is to manufacture and ship methanol to China for use as feedstock to manufacture olefins used in the production of plastics and other materials.  EA at 34.  The Corps acknowledges that the Export Terminal and Lateral Project do not have independent utility from the Refinery and would not be built without the Refinery.  *Id.* at 3.

36.     The Kalama Project's proponents include NWIW, the Port of Kalama (the "Port"), and Northwest Pipeline LLC ("Northwest Pipeline").

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
- 14 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

37.     NWIW is a U.S. registered company ultimately owned entirely by the Chinese Government and its officials.  NWIW will build and operate the Refinery on Port of Kalama property.  NWIW also proposed two other nearby methanol refineries, including one in Tacoma that was withdrawn and the other pending in Port Westward, Oregon.

38.     The Port of Kalama is a port district created under Washington State law and run by elected commissioners.  It owns the upland property where NWIW will build the Refinery. The Port will build the Export Terminal.  The Port applied to the Army Corps for a CWA § 404 and Rivers and Harbors Act § 10 permit for the Export Terminal.  The Port also prepared—in cooperation with Cowlitz County—the related state environmental impact statements under SEPA.

39.     Northwest Pipeline LLC is the owner of a pipeline system that will supply gas from Canada to the Refinery.  It will build and operate the 3.1 mile Lateral Project.  It received a certificate of public convenience and necessity from FERC authorizing the Lateral Project under the Natural Gas Act.  EA at 2.  Prior to issuing the certificate, FERC reviewed the environmental impacts of approving the Lateral Project in a 2015 Environmental Assessment ("FERC EA"). EA at 2, 30.  The Corps was a cooperating agency in the FERC EA.  *Id.*  Northwest Pipeline applied to the Army Corps for a separate CWA § 404 permit for the Lateral Project.

40.     NWIW will build the Refinery on 90 acres of Port property at River Mile 72.  The Refinery includes the methanol manufacturing equipment, storage tanks, a new dock and related equipment, and a new fracked gas-fired power plant to provide some of the electricity needed for the manufacturing facility, among other components.  The Refinery will receive fracked gas from the Lateral Project and convert it to methanol by adding steam and a catalyst, and then

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

distilling it into a liquid.  The Refinery will have storage tanks that will hold methanol and then transport it through pipelines connected to the Export Terminal.

41.     The Port will build the Export Terminal, which includes a new dock and new berth created by dredging.  An estimated 72 ships per year would then take the methanol from the Export Terminal to China for the production of olefins.  The anticipated yearly production at full capacity is estimated to be 3.6 million metric tons of methanol.

42.     The Kalama Project's energy demands will be met using a combination of grid electric power and onsite power generation.  Power derived from the electric grid will be made possible by upgrades to the electric transmission lines to the Kalama Project site.  The remaining power will be generated by an onsite 125-megawatt gas power generation facility.

43.     The greenhouse gas emissions attributable to the Refinery are massive. The emissions associated with the manufacturing process alone will easily exceed 1,000,000 tons of carbon dioxide per year. This does not include the substantial upstream and downstream emissions caused by the project, such as emissions associated with the extraction and transport of the large volumes of gas the Refinery will use, or the transport of the methanol to China and the conversion of methanol into olefins.  It also fails to include induced or indirect effects that will be the likely and foreseeable result of the large new gas pipeline that the Refinery will cause to be built.

44.     NWIW applied to the U.S. Department of Energy ("DOE") for a $2 billion loan guarantee to insure its $2 billion investment in the Refinery.  DOE is a co-author of the EA and intends to rely on the EA as its NEPA review of issuing the loan guarantee to NWIW.  Upon information and belief, DOE has not yet acted on NWIW's loan application.

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

B.      State Environmental Impact Statements and Prior Litigation

45.     The State of Washington required permits for the Kalama Project and an environmental review under SEPA.  In September 2016, Cowlitz County and the Port of Kalama issued the Final EIS, in which they concluded the project will not result in any unavoidable significant adverse impacts to the environment.

46.     In a challenge brought by plaintiffs Columbia Riverkeeper, Sierra Club, and Center for Biological Diversity, the Washington Shorelines Hearings Board, a state adjudicatory body, found that the Final EIS failed to adequately analyze greenhouse gas impacts of the Kalama Project.

47.     On appeal, the Washington Superior Court in July 2018 upheld the Board's summary judgment finding that the County and Port failed to adequately analyze the greenhouse gas impacts of the project in the Final EIS and directed them to prepare a supplemental EIS that does so.

48.     The Port issued a draft supplemental EIS on November 13, 2018.

49.     The Port shared the Final EIS and the draft supplemental EIS with the Corps.  EA at 145.  The Corps reviewed and relied on the Final EIS and draft supplemental EIS in its analysis of greenhouse gas impacts.  *Id.* at 113, 145, 164, 167, 168.  The Corps published its EA before the Port and County published the Final Supplemental EIS on August 30, 2019.

C.      The Corp's Environmental Assessment

50.     In 2015, the Port and Northwest Pipeline applied to the Corps for a permit to dredge and fill under CWA § 404 to build the Export Terminal.  Also in 2015, NWIW applied to DOE for a $2 billion loan guarantee to insure its entire investment in the refinery.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

- 17 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

51.     The Corps led the NEPA review and preparation of the EA for the Kalama

Project.  According to the EA, the scope of review under NEPA includes the entire Kalama

Project, including the refinery.  EA at 31.  The geographic assessment area for the Corps'

cumulative impacts review includes the boundaries in the Lower Columbia Clatskanie

Watershed described in paragraph 9.2 of the EA.  *Id.* at 160.  According to the Corps, the

document it prepared includes the Environmental Assessment, Section 404(b)(1) Guidelines

Evaluation, Public Interest Review, and Statement of Findings for the Export Terminal and

Lateral Project permits.  *Id.* at 3.

52.     The Corps also participated in the 2015 FERC EA for the Lateral Project as a

cooperating agency.  *Id.* at 2.  The FERC EA evaluates, among other things, the Lateral Project's

greenhouse gas impacts in Washington State.  *Id.* at 54, 113; FERC EA at 62, 64-66, 83-84.  The

FERC EA does not consider the upstream impacts from additional fracking of gas in Canada or

the downstream impacts from shipping to China or production from methanol to olefins.  FERC

EA at 62, 64-66, 83-84.

53.     DOE participated in the EA for its NEPA review in considering the loan

guarantee to support construction and startup of the proposed Refinery.  EA at 3-4.  The EA

constitutes DOE's environmental assessment in consideration of the potential loan guarantee.  *Id.*

54.     The Corps consulted with NMFS to consider impacts to endangered and

threatened species under the ESA.  NMFS issued its BiOp on October 10, 2017, for the Export

Terminal and Lateral Project as the Proposed Action and the Refinery as a related action.  BiOp

at 1-2.  The BiOp considered impacts to various species of endangered and threatened salmon,

steelhead, and eulachon; endangered Southern Resident killer whales; and leatherback sea

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

- 18 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

turtles; among other species.  *Id.*  NMFS found no-jeopardy to the species considered and no

destruction or adverse modification to designated critical habitat.  *Id.*

55.     The Corps issued the EA on January 18, 2018, and CWA § 404 and Rivers and

Harbor Act section 10 permit for the Export Terminal on April 1, 2019.  DOE has not yet issued

a loan guarantee for the Refinery.

## II.    THE CORPS' REVIEW OF DIRECT, INDIRECT, AND CUMULATIVE EFFECTS UNDER NEPA

56.     In its scope of review for cumulative effects, the Corps considered the whole

Kalama Project.  EA at 158-59.  However, the Corps limited the geographic scope of the

cumulative effects assessment area to the Lower Columbia Clatskanie Watershed (the

"Assessment Area").  *Id.* at 160.

57.     The Corps did not describe any direct effects of greenhouse gas emissions from

the Kalama Project.  *Id.* at 158-59.

58.     In identifying the Kalama Project's indirect effects, the Corps acknowledged that

the Project would cumulatively increase the volume of greenhouse gases emitted into the

atmosphere.  *Id.* at 164, 113-14.  It asserted that the majority of greenhouse gas emissions would

be caused by the Refinery, which would contribute nearly 1,000,000 metric tons of greenhouse

gases per year for a project lifetime of 40 years.  *Id.*  This represents a 1% increase in statewide

greenhouse gas totals from 2013.  *Id.*

59.     The EA also referenced generally the effects of the Export Terminal and Lateral

Project, which for greenhouse gas emissions included construction, increased vessel traffic, and

fracked gas leakage in the Assessment Area.  *Id.* at 112-13.

60.     The Corps claimed that the increase in greenhouse gas emissions would be

reduced by several measures.  First, the EA stated that the increase in vessel greenhouse gas

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

- 19 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

emissions will be reduced by vessels docked at the Export Terminal using electricity from onshore rather than on-board fuel fossil-fueled engines or generators, although the EA noted that on-shore power would not always be used.  *Id.* at 112-13.  Second, the EA stated that NWIW's use of Ultra Low Emission technology—a process that reuses heat and uses gas boilers—was itself mitigation for increased greenhouse gas emissions.  *Id.* at 113-14, 167.  Third, the EA stated that NWIW would voluntarily mitigate 100% of all greenhouse gas emissions in the State of Washington from the Refinery by purchasing carbon credits or paying the amount of carbon credits into a greenhouse gas fund.  *Id.* at 114, 164, 167.  No mitigation was proposed for the Lateral Project's greenhouse gas emissions because it "would contribute a negligible increase to regional GHG emissions."  *Id.* at 167; FERC EA at 83-84.

61.    The EA did not describe the greenhouse gas emissions or climate impacts beyond Washington State, for example, vessel traffic to China, manufacturing of olefins in China, or increased gas extraction in Canada.  Yet, it claimed greenhouse gas emission reductions from displacing coal-based methanol production in China due to alleged future cost advantages.  EA at 164.

62.    The Corps disclaimed its ability to consider end use of methanol as too attenuated and far removed.  *Id.* at 54.  However, the state draft supplemental EIS, on which the Corps relied for its greenhouse gas findings, did analyze downstream emissions associated with shipping of methanol.  Draft Supplemental EIS at 3-23.  However, the draft omitted 420,000 tons of greenhouse gas emissions from turning methanol into olefins.  *Id.*, Draft Supplemental EIS App. A at 92.  The Corps did not include any of this analysis in its EA.

63.    Though the Corps did not analyze the downstream emissions of greenhouse gas emissions, the Corps claimed—based on the draft supplemental EIS—that due to the speculative

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

future cost advantages, producing methanol in Kalama would displace methanol production from existing coal-based plants in Asia that have approximately 5.5 to 6.2 times higher greenhouse gas emissions and would therefore result in a "net global reduction of GHGs." EA at 164, 167. This estimate is based on projections for coal and gas prices for the next 40 years of the Project's lifecycle. Draft Supplemental EIS 3-13, 3-23, App. A at 112.

64.    The Corps did not analyze or discuss upstream induced effects of fracked gas extraction, including the development of a new regional gas pipeline to meet the increased demand.

III.    PUBLIC INTEREST BALANCING UNDER THE CLEAN WATER ACT

A.    Public Interest

65.    In balancing the public interest of the Kalama Project, the Corps' regulations implementing the CWA require that it base the decision to issue a permit on "an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest." 33 C.F.R. § 320.4. The Corps must balance "the benefits which reasonably may be expected to accrue from the proposal" against "its reasonably foreseeable detriments." *Id.* A permit will be granted unless the Corps determines it would be contrary to the public interest. *Id.*

1.    *Greenhouse Gas Impacts*

66.    The Corps excluded the Refinery's greenhouse gas emissions from review under the public interest analysis by claiming that the Refinery was outside the Corps' jurisdiction, even though the Corps acknowledged that most greenhouse gas emissions result from the Refinery. EA at 148. At the same time, the Corps acknowledged that the Refinery was part of one overall project, that the Export Terminal had no independent utility from the Refinery, and

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104*
*(206) 343-7370*

even imputed the Refinery's benefits to the Export Facility to conclude that the Project was not contrary to the public interest.

67.     The Corps discussed the short term economic benefits of employment and revenue from the construction of the Kalama Project and long-term economic benefits of employment and revenue from the Export Terminal and Refinery.  *Id.* at 109-10.  The Corps stated that even though the Lateral Project would be automated in the long term, it would provide economic benefit by supporting the operation of the Refinery.  *Id.*  Additionally, the Corps described that one of the benefits from the Lateral Project was that it would supply energy to the Refinery.  *Id.* at 139.

68.     In considering the reasonably foreseeable detriments, the Corps asserted on the basis of the Final EIS, Draft Supplemental EIS, and FERC EA, that the Export Facility and Lateral Project would result in a negligible release of greenhouse gases into the atmosphere when compared to global greenhouse gas emissions.  *Id.* at 112-13; 145.  The Corps claimed that they are not expected to generate quantities of greenhouse gases beyond that which is typical for export facilities or gas pipelines of a similar size.  *Id.* at 112-13.  The EA included greenhouse gas emissions from construction, loss of aquatic sinks, increased vessel traffic in the Export Terminal, and "minor amounts of fugitive methane emissions which would have a minor adverse effect on greenhouse gas emissions" from the Lateral Project.  *Id.* at 145-148, 112-13.  The Corps described the detriments from the Export Terminal and Lateral Project as minimal and permanent.  *Id.* at 147-48.

### 2.     *Other Public Interest Factors*

69.     In its public benefit analysis, the Corps did little to explain the economic benefits of the Export Terminal other than describe the unemployment rate in Cowlitz County and claim

*Earthjustice*
810 Third Ave., Suite 610
Seattle, WA 98104
(206) 343-7340

that it would temporarily increase jobs and revenue from construction and in the long run generate jobs for the Export Terminal and Refinery. EA at 109. The Corps did not discuss the number of jobs, length of time of expected jobs, or expected revenue to the region.

70. The Corps found that the Project will have a negligible effect on aesthetics, largely because the site is already zoned for industrial use. *Id.* at 110-111. However, the refinery and terminal would dominate views of the North Port site, substantially changing the visual character of this area. The 245-foot flare stack—required to dispose of flammable gases—would be one of the tallest structures in the entire county, looming 100 feet taller than Kalama's iconic totem pole. In addition to buildings and smokestacks, vapor plumes from the refinery's cooling towers could extend thousands of meters into the air.

71. The Corps also minimized the effect the project will have on recreation at the site and along the relevant stretch of the Columbia River. *Id.* at 132–134. The public is currently able to access, park, and recreate at this location.

IV.    IMPACTS TO ENDANGERED AND THREATENED SPECIES

72. As required under the Endangered Species Act, the Corps consulted with NMFS to assess whether the Kalama Project would jeopardize endangered or threatened species or adversely modify their critical habitat. 16 U.S.C. § 1536(a)(2). NMFS prepared a biological opinion, with an accompanying Incidental Take Statement for the Export Terminal and Lateral Project, finding, among other things, "no jeopardy" to various populations of salmon and steelhead, Southern Resident killer whales, and leatherback sea turtles and "no adverse modification" to critical habitat. NMFS did not consider the Refinery as part of the Proposed Action it reviewed.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

- 23 -

73.     NMFS regulations require that the Incidental Take Statement specify the amount or extent of allowed take, provide reasonable and prudent measures necessary to minimize the impact of that take, and set forth terms and conditions that must be followed to implement such measures.  16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(1), (3).  The failure to make those measures mandatory is a violation of the ESA and the implementing regulations.

A.     Failure to Set Valid Incidental Take Limits

74.     NMFS concluded that the Proposed Action was not likely to jeopardize the continued existence of several populations of endangered and threatened salmon and eulachon because (1) only small numbers of salmon, most likely Chinook, would be affected by wake stranding from ships in the Columbia River transiting to and from the Export Terminal and the Pacific Ocean and (2) the impact of the increase in vessel traffic from the Proposed Action was unlikely to increase bank erosion or shoreline armoring to an extent that it would have an impact on salmon and eulachon.

75.     As described in the biological opinion, wake stranding occurs when large, deep-draft vessels produce wakes that strand juvenile salmon on beaches.  BiOp at 96.  Wake stranding has been identified as a threat to recovery of several salmon species on the Columbia River.  *Id.*  The increase in vessel traffic from the Proposed Action will likely increase stranding and death of certain species of salmon.  *Id.*  Wake stranding is identified as a limiting factor in listings or recovery plans several salmon species, including Chinook, which are particularly vulnerable because of their small size.  *Id.*

76.     NMFS considered in its analysis a study of the Proposed Action area finding that 36% of vessel traffic led to strandings.  *Id.* at 97.  During 126 observed vessel passings, 426 Chinook, 8 chum, and 7 coho were identified as stranded.  *Id.* at 97.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
- 24 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

77.     Even though the biological opinion stated that "the effects [] likely to result in measurable effects to listed fish are … wake stranding and erosion from ship traffic," *Id.* at 106, NMFS concluded that the increased number of ship passages from the Proposed Action (72 per year) would not increase mortality caused by wake stranding enough to have an observable impact on the long-term abundance trends of any of the affected species or their populations. *Id.* at 98.

78.     The increased vessel traffic will also cause river bank erosion and will likely promote bank or shoreline armoring to protect the property. *Id.* at 99.  The biological opinion states that shoreline armoring "removes existing off channel habitat or precludes the formation of off channel habitat that is important for rearing juvenile salmon." *Id.* at 99.  NMFS concludes that bank erosion and shoreline armoring effects are expected to be minor due to the low number of vessels expected from the Proposed Action (72/year), though it does not provide any analysis of the amount of erosion expected. *Id.* at 81; *cf. id.* at 116.

79.     Incidental take of various populations of Chinook and steelhead caused by the Proposed Action includes increased in-water predation from the dock's overwater coverage and elevated sound levels from construction. *Id.* at 125-26.

80.     In the Incidental Take Statement, NMFS uses the limits of the proposed action itself as take limitations.  NMFS sets the dock's square footage—10,925 square feet—as the extent of take for overwater coverage. *Id.* at 126.  It sets the expected number of pile strikes for driving steel piles for the dock as a surrogate for incidental take caused by elevated sound levels. *Id.* at 126.  NMFS does not explicitly call stranding or shoreline armoring incidental take, but uses the number of the Proposed Action's vessel trips (72/year) as a surrogate for extent of take

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

- 25 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

caused by stranding because, according to NMFS, there is limited understanding of the variables that contribute to wake stranding and little data to provide a take estimate. *Id.* at 125-26.

81.     Southern Resident killer whales are highly endangered.  There are 73 wild individuals.  According to NMFS, the loss of a single individual, or the decrease in reproductive capacity of a single individual, is likely to appreciably reduce the likelihood of survival and recovery of the Southern Residents.

82.     For Southern Resident Killer Whales, NMFS concluded that the risk of ship strikes was minimal because the increase in vessel traffic in the action area was small, ship strikes are a rare event, and the Proposed Action area is a small portion of available marine mammal habitat.  *Id.* at 109.

83.     NMFS acknowledged that due to overlap of heavy shipping traffic and high whale density, Oregon and Washington waters are a high-risk area for ship strike events.  *Id.* at 108.  Ship strikes have an equal chance of affecting individuals of different species, so NMFS did not conduct an individual analysis of each species of marine mammal.  *Id.* at 108.  Eighty-seven percent of fatal ship strikes involved ships more than 250 feet long and the greatest probability of lethal injury to a large whale occurs between speeds of 8.6 to 15 knots.  *Id.* at 109.

84.     The ships used in the Proposed Action will be 600-900 feet long and will travel up to 20 knots.  *Id.* at 109.  There are no regulations in place to restrict ship activity in the vicinity of the whales in the Proposed Action Area, although NOAA Fisheries West Coast Region has voluntary Recommendations to Avoid Collisions.  *Id.* at 109.  NMFS assumes that any whales struck by ships from the Proposed Action will likely die as a result of collision.  *Id.* at 109.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

- 26 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

85.     NMFS acknowledged that the Proposed Action will lead to increased vessel traffic, which will result in some increased risk of ship strike and a high likelihood of death if struck. *Id.* at 109.  However, it did not analyze the potential for strike events, claiming it had limited information on the incidence of ship strikes to determine how a particular number of ship transits would increase ship strike events. *Id.* at 109.  Nonetheless, it qualitatively determined that the relative number of ship transits in the Proposed Action was small compared to the total, and therefore the risk was small. *Id.* at 109.

86.     In reviewing the impacts to Southern Resident killer whale populations specifically, NMFS found one collision in 2005 that resulted in minor injury, one fatal collision in 2006, and no mortality or serious injuries between 2007-2011. *Id.* at 130.  NMFS did not include in its analysis the 2016 fatal collision of J34 ("DoubleStuf"), an 18-year-old male member of J pod.  NMFS acknowledged that Southern Residents overlap with the Proposed Action area—NMFS tagging data shows the presence of Southern Residents in the Proposed Action area at the mouth of the Columbia River—but discounted the risk of collision because Southern Resident killer whales are not reported to interact with large ships. *Id.* at 130.

87.     The biological opinion does not set an incidental take limit for Southern Resident killer whales.

88.     Leatherback sea turtles have been listed as endangered since 1970 and their numbers continue to decline in the Pacific. *Id.* at 60-61.  They have been documented to forage in the Columbia River Basin and have critical habitat in the Kalama Project action area. *Id.* at 60, 61, 85.  Ship strikes are likely to occur in the action area, are a significant source of mortality to sea turtles, and go largely unreported. *Id.* at 82, 85.

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7370*

89.     NMFS did not provide for take exemption for third-party incidental take of the leatherback sea turtle in the Incidental Take Statement, claiming that it would be difficult to provide reasonable and prudent measures, terms and conditions, or a meaningful reinitiation trigger. *Id.* at 126.

CLAIMS FOR RELIEF

FIRST CLAIM FOR RELIEF

Corps' Violation of National Environmental Policy Act
and Administrative Procedure Act: Failure to Prepare an EIS

90.     Under NEPA, federal agencies are required to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).

91.     CEQ regulations further define whether impacts are "significant" enough to warrant a full EIS, requiring consideration of both "context" (i.e., the various scales, regions, and interests affected by the action) and "intensity" (i.e., the "severity of the impact"). 40 C.F.R. § 1508.27.  With respect to the latter, the regulations lay out ten factors that are to be considered. Examples of these criteria include: the degree to which the proposed action affects public health or safety; the degree to which the possible effects on the human environment are likely to be highly controversial; the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks; the degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration; whether the action is related to other actions with individually insignificant but cumulatively significant impacts; and the degree to which the action may adversely affect an endangered or threatened species or its habitat.  *Id.*

92.     The Corps issued an EA and Finding of No Significant Impact in violation of NEPA's requirement to prepare an EIS where, as here, the action would have significant

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

- 28 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

environmental impacts.  The Refinery alone would emit more than 1,000,000 tons of greenhouse gases per year at an estimated 40 year project lifespan.  Upstream, it would create additional greenhouse gas emissions from increased demand for fracked gas from Canada, induced development of additional pipeline infrastructure, increased gas leakage, and increased consumption of electricity and fossil fuels from operation and construction.  Downstream, it would cause additional greenhouse gas emissions from shipping methanol to China, production of olefins from methanol, and potential use as fuel.  These increases in greenhouse gas emissions impact climate change, which affects public health and safety, are highly controversial, involve known risks, may establish precedent for future actions, and have cumulative impacts.  The Kalama Project adversely affects endangered and threatened species by wake stranding, shoreline armoring, vessel strikes, and degraded habitat.

93.     The Corps acted arbitrarily, capriciously, and contrary to the evidence before it, in violation of NEPA and CEQ regulations, and contrary to the APA, 5 U.S.C. § 706(2)(A), in failing to prepare a full EIS on the Kalama Project.

## SECOND CLAIM FOR RELIEF

### Corps' Violation of National Environmental Policy Act and Administrative Procedure Act

A.     Improper Segmentation of Project Components and Limited of Scope of Review

94.     NEPA requires consideration of separate components of a single project in a single NEPA review.  40 C.F.R. § 1508.25.  NEPA regulations state that connected actions should be considered in a single EIS, defining connected actions as one that "cannot or will not proceed unless other actions are taken previously or simultaneously," and "are interdependent parts of a larger action and depend on the larger action for their justification."  *Id*.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

- 29 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

95.     The Corps mixed and matched the three project components--refinery, marine vessel terminal, and lateral pipeline—as conveniently suited its stage of analysis.  Although the EA includes the Refinery in the scope of review, it ignores greenhouse gas emissions from the Refinery in its alternatives review; it excludes the Refinery from the CWA Public Interest review; it improperly limits the geographic assessment area; and it excludes significant upstream and downstream greenhouse gas emissions from its cumulative impacts review.

96.     By improperly segmenting the Refinery from the Export Terminal and Lateral Project, the Corps severely underestimates the Kalama Project's greenhouse gas emissions and has acted in a manner that is arbitrary, capricious, and not in accordance with law, in violation of NEPA and the APA, 5 U.S.C. § 706(2)(A).

B.      Failure to Take a Hard Look at Indirect Impacts

97.     NEPA requires agencies to take a hard look at the direct, indirect, and cumulative impacts of a proposed action.  Indirect effects of a project are those that are caused by the project and reasonably foreseeable, which may be later in time or farther removed in distance.  Agencies cannot avoid their responsibility to consider future effects by claiming they are uncertain, because NEPA requires some element of predictive behavior.  Courts have generally recognized downstream greenhouse gas pollution and upstream induced growth of extraction activities as indirect effects of fossil fuel projects.  Agencies must use high quality, accurate scientific information to ensure the scientific integrity of the analysis. 40 C.F.R. §§ 1500.1(b), 1502.24.

98.     To the extent that the Corps discussed the indirect and cumulative effects of the project's emissions, the Corps relied on the flawed and incomplete state Draft Supplemental EIS. The Draft Supplemental EIS relies on faulty assumptions and NWIW's theory that methanol will

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

displace higher greenhouse gas emissions of coal for producing olefins for plastics based on future speculative market forces.

99.     The EA fails to consider combustion of methanol for fuel as a downstream end-use of the project's methanol that would have additional greenhouse gas impacts.  NWIW's leadership has given presentations stating that that methanol produced by the project may entirely or partially be used for fuel.  The inclusion of a requirement that methanol from the Project cannot be used for fuel does not cure the Corps' failure to consider this end use. Moreover, inclusion of the requirement raises questions about the County and Port's interest and ability to enforce the requirement, including potential jurisdictional issues and privity of contract.

100.     The EA fails to consider the upstream induced growth caused by the Project.  The Corps considered the upstream impact of its own additional fracked gas use, but ignored the impact the Project would have on the regional gas infrastructure and the demand for fracked gas extraction.  NWIW itself acknowledged that current infrastructure is overtaxed and will need to be expanded in the near future, particularly because of its own projects.  Similarly, public comments from regional gas associations state that gas prices are increasing because of infrastructure constraints.  Yet, the Corps excluded expansion of the pipeline system as hypothetical, speculative, and not reasonably foreseeable.  The EA also failed to consider the impacts that the project would have on increased demand for fracked gas, in part because the Corps limited the scope of review to the impacts in Washington State and the source of the Project's gas is Canada.  Courts have recognized that increasing demand for gas will at the very least increase the quantity consumed and increase production which may affect the price relative to other energy sources.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
- 31 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

101.    The Corps' failure to consider reasonably foreseeable indirect and cumulative upstream and downstream impacts, and its finding that the Kalama Project has no significant impact based on an inadequate EA is arbitrary, capricious, not in accordance with the law, and in violation of NEPA and the APA, 5 U.S.C. § 706(2)(A).

C.      Improper Reliance on Mitigation

102.    NEPA requires agencies to disclose and analyze measures to mitigate the impacts of proposed actions.  40 C.F.R. §§ 1502.14(f), 1502.16(h).  Mitigation measures include avoiding the impact by not taking a certain action or parts of an action, limiting the degree or magnitude of the action, restoring the affected environment, preserving the environment or maintaining operations during the life of the action, or compensating for the impact by replacing or providing substitute resources or environments.  40 C.F.R. § 1508.20.  The EA only presented this last form of mitigation—compensation through a greenhouse gas bank to offset the greenhouse gas emissions in Washington State alone.

103.    The Corps described that NWIW would voluntarily purchase mitigation credits or make the equivalent contribution to greenhouse gas banks to offset 100% of the greenhouse gas emissions from the Refinery in Washington State.  The Corps concluded on this basis that the Refinery will have an adverse effect that will be neutralized by mitigation.  However, this mitigation plainly does not offset the Kalama Project's total greenhouse gas emissions because it ignores the upstream and downstream greenhouse gas emissions outside of the Refinery and Washington State.  Mitigation is not proposed for the Export Terminal or Lateral Project because the EA described those emissions as reduced or de minimis.

104.    Reliance on mitigation measures is not a substitute for the Corps compliance with NEPA's mandate to examine potential significant environmental impacts.  An agency cannot

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
- 32 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

rely on mitigation measures to avoid performing a detailed analysis of the environmental impacts of an action.  Mitigation must also be enforceable, and because the mitigation is voluntary, the Corps cannot ensure compliance with mitigation through monitoring or other means.

105.     By improperly relying on mitigation promises and failing to analyze mitigation measures, the Corps severely underestimates the Kalama Project's greenhouse gas emissions and has acted in a manner that is arbitrary, capricious, and not in accordance with law, in violation of NEPA and the APA, 5 U.S.C. § 706(2)(A).

THIRD CLAIM FOR RELIEF

Corps' Violation of Clean Water Act
and Administrative Procedure Act: Inadequate Public Interest Review

106.     Prior to issuing any CWA permit, the Corps must conduct a "public interest" review consistent with its governing regulations.  33 C.F.R. § 320.4(a).  In conducting a public interest review, the Corps must consider the probable impacts of the proposed action and reasonably foreseeable detriments, while weighing "all those factors which become relevant in each particular case." *Id.*

107.     The Corps excluded the Refinery from its public interest review, claiming that it was outside the Corps' jurisdiction.  However, the Corps imputed the benefits from the Refinery to the Export Terminal and Lateral Project in balancing the public interest in those projects.  It should not then be allowed to exclude the foreseeable detriments from the Refinery of greenhouse gas emissions, especially where NEPA requires that the Corps review connected projects together when they are simultaneous and interdependent.

108.     The Corps' public interest review, as described above, overestimated the economic benefit and profitability of the Kalama Project, failed to consider loss of property values and degraded aesthetic value, and underestimated recreation value.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

- 33 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7370*

109.     It is in the public interest to reduce greenhouse gas emissions and Washington State has codified greenhouse gas reduction targets through 2050.  RCW Chapter 70.235.

110.     The Corps public interest review is inadequate, arbitrary, not in accordance with law and in violation of the CWA, the Rivers and Harbors Act, and the APA, 5 U.S.C. § 706(2)(A).

FOURTH CLAIM FOR RELIEF

NMFS Violation of Endangered Species Act
and Administrative Procedure Act:
Failure to Quantify Take in the Incidental Take Statement

111.     The ESA requires that federal agencies ensure that their actions are not likely to jeopardize the continued existence of threatened and endangered species or result in the destruction or adverse modification of critical habitat.  16 U.S.C. § 1536(a)(2).

112.     ESA § 7(b)(4) requires FWS to issue an incidental take statement whenever a proposed federal agency action will not jeopardize a protected species but will result in incidental take of members of the species.  16 U.S.C. § 1536(b)(4).  The incidental take statement must specify "those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact" and "the terms and conditions … that must be complied with by the Federal agency … to implement the measures."  *Id.*

113.     The incidental take statement must also "specif[y] the impact, i.e., the amount or extent, of such incidental taking on the species."  50 C.F.R. § 402.14(i)(i).

114.     NMFS has violated Section 7(b)(4) of the ESA, 16 U.S.C. § 1536(b)(4), by issuing an incidental take statement with the Biological Opinion that fails to adequately quantify take.  For populations of fish in the action area, NMFS set the take limit equal to the amount of take that the project as planned will cause—the amount stranded by an increase 72 vessels per

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

- 34 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

year and the amount harmed from noise by the number of pile strikes required to build the dock. BiOp at 125-26.

115.     Although the biological opinion confirms that the increased vessel traffic threatens injury and death to southern resident killer whales from vessel strikes and prey limitations, NMFS did not evaluate the likelihood of take or provide a limitation on take for this highly imperiled population.  *Id*. at 130-31.

116.     For leatherback sea turtles, the biological opinion confirms that project will increase the risks to sea turtles from ship strikes, and NMFS estimated the frequency with which leatherback sea turtles might interact with the number of ships in the Proposed Action area (based on coastal population numbers in California).  However, due to claimed "uncertainty," NMFS did not use any data to establish the likelihood of take and set no incidental take limit at all.

117.     NMFS's actions and omissions are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law and are reviewable under the APA, 5 U.S.C. §§ 701 – 706.

PRAYER FOR RELIEF

WHEREFORE, the plaintiffs respectfully request that the Court:

1.     Declare that the Corps' CWA 404 permit NWP-2014-177/2 for the Kalama Project violates the CWA, its implementing regulations, and the APA;

2.     Declare that the EA and FONSI issued by the Corps for the Kalama Project violate NEPA, its implementing regulations, and the APA;

3.     Vacate Corps' permit NWP-2014-177/2 and the underlying EA and FONSI;

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
- 35 -

4.     Declare that the Biological Opinion and Incidental Take Statement issued by NMFS for the Kalama Project violate the ESA, its implementing regulations, and the APA;

5.     Order NMFS to rescind the Incidental Take Statement and reconsult to issue a valid Incidental Take Statement;

6.     Award plaintiffs their reasonable fees, costs, expenses, and disbursements, including attorneys' fees, associated with this litigation; and

7.     Grant such further declaratory and injunctive relief as the Court may deem just and proper.

DATED this 12th day of November, 2019.

Respectfully submitted,


*/s/ Kristen L. Boyles*
KRISTEN L. BOYLES, WSBA #23806
Earthjustice
810 Third Avenue, Suite 610
Seattle, WA  98104-1711
Ph.:  (206) 343-7340
Fax: (206) 343-1526
kboyles@earthjustice.org

*Attorney for Plaintiffs*

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

- 36 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*