1
2
3
4
5
6                                          THE HONORABLE ROBERT J. BRYAN
7
8                        UNITED STATES DISTRICT COURT
                     FOR THE WESTERN DISTRICT OF WASHINGTON
                                 TACOMA DIVISION
9

10   COLUMBIA RIVERKEEPER, SIERRA          )
     CLUB, CENTER FOR BIOLOGICAL           )   Cause No.  3:19-cv-06071-RJB
11   DIVERSITY, WASHINGTON                 )
     ENVIRONMENTAL COUNCIL, and            )   PLAINTIFFS' MOTION FOR
12   WASHINGTON PHYSICIANS FOR             )   SUMMARY JUDGMENT
     SOCIAL RESPONSIBILITY,                )
13                                         )   **NOTE ON MOTION CALENDAR:**
                         Plaintiffs,       )   **Friday, November 6, 2020**
14                                         )
     v.                                    )   **ORAL ARGUMENT REQUESTED**
15                                         )
16   UNITED STATES ARMY CORPS OF           )
     ENGINEERS, and NATIONAL MARINE        )
17   FISHERIES SERVICE,                    )
                                           )
18                       Defendants.       )
19          and                            )
                                           )
20   PORT OF KALAMA,                       )
                                           )
21                  Intervenor-Defendant.  )
22   _____)

23
24
25
26
27
28
     PLAINTIFFS' MOTION                           *Earthjustice*
29   FOR SUMMARY JUDGMENT                          *810 Third Ave., Suite 610*
     CAUSE NO. 3:19-CV-06071-RJB                   *Seattle, WA  98104*
                                                   *(206) 343-7340*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ............................................................................................... 3

    I.     THE KALAMA METHANOL PROJECT ............................................. 3

    II.    STATE COURT CHALLENGES TO ENVIRONMENTAL REVIEWS
          AND PERMITS ..................................................................................... 5

    III.   THE CORPS' REVIEW AND PERMITS ............................................. 6

          A.   The Clean Water Act and Rivers and Harbors Act ............................ 6

          B.   The National Environmental Policy Act ............................................ 7

          C.   The Endangered Species Act ............................................................ 8

STANDARDS OF REVIEW ............................................................................ 9

ARGUMENT ................................................................................................ 10

    I.     THE CORPS IGNORED THE INDIRECT AND CUMULATIVE
          GREENHOUSE GAS IMPACTS CAUSED BY THE KALAMA
          PROJECT ............................................................................................ 10

          A.   NWIW's Gas Consumption Will Require Building a New Regional
              Fracked Gas Pipeline. ..................................................................... 12

          B.   The Kalama Project Will Create Significant Greenhouse Gas
              Emissions from Shipping Methanol to China, Producing Olefins, and
              Using Methanol as Fuel. .................................................................. 14

          C.   The Corps Failed to Consider the Cumulative Impacts of the Kalama
              Project's Greenhouse Gas Emissions and Other Reasonably
              Foreseeable Fossil Fuel Projects. ................................................... 16

    II.    THE CORPS FAILED TO PREPARE AN ENVIRONMENTAL
          IMPACT STATEMENT TO EVALUATE THE PROJECT'S
          SIGNIFICANT EFFECTS ................................................................ 17

          A.   The Kalama Project's Environmental Effects Are Highly
              Controversial. ................................................................................. 18

          B.   The Kalama Project's Geographic Area Has Unique Wetland, Scenic
              Areas, Recreation, and Habitat Characteristics. ............................. 19

PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT          i
CAUSE NO. 3:19-CV-06071-RJB

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7310*

C.  The Kalama Project Harms Threatened and Endangered Species..................21

D.  The Corps Failed to Consider the Kalama Project's Full/Non-
Segmented Impacts. ..........................................................................................21

III.  NMFS FAILED TO SET TAKE LIMITS FOR ENDANGERED AND
THREATENED SPECIES OF SALMON, SEA TURTLES, AND
SOUTHERN RESIDENT KILLER WHALES. ................................................... 22

A.  The Incidental Take Statement Unlawfully Used Take Surrogates
That Are Coextensive with the Scope of the Project.....................................23

B.  NMFS Failed to Provide Valid Surrogates for Take. ....................................25

C.  NMFS Failed To Set a Take Limit for Southern Resident Killer
Whales. .............................................................................................................27

IV.  THE CORPS' PUBLIC INTEREST ANALYSIS IGNORED THE
PROJECT'S COSTS.............................................................................................. 28

A.  The Corps Considered Economic Activity That is Beyond the Proper
Scope of the Public Interest Analysis. ...........................................................29

B.  The Corps' Public Interest Review of the Export Terminal Arbitrarily
Counted the Benefits—but not the Significant Costs—of the Refinery.........30

**CONCLUSION** ....................................................................................................................... **33**

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*,
  273 F.3d 1229 (9th Cir. 2001) ....................................................................... *passim*

*Blue Mountains Biodiversity Project v. Blackwood*,
  161 F.3d 1208 (9th Cir. 1998) .................................................................................18

*Buttrey v. United States*,
  690 F.2d. 1170, 1180 (5th Cir. 1982) .............................................................29, 30

*Conner v. Burford*,
  848 F.2d 1441 (9th Cir. 1988) ...................................................................................9

*Ctr. for Biological Diversity v. BLM*,
  833 F.3d 1136 (9th Cir. 2016) .................................................................................28

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
  508 F.3d 508 (9th Cir. 2007) ...................................................................................17

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
  538 F.3d 1172 (9th Cir. 2008) .................................................................................17

*Ctr. for Biological Diversity v. Salazar*,
  695 F.3d 893 (9th Cir. 2012) ...................................................................................25

*Defenders of Wildlife v. U.S. Envtl. Prot. Agency*,
  420 F.3d 946 (9th Cir. 2005) .....................................................................................9

*Delaware Riverkeeper Network v. FERC*,
  753 F.3d 1304 (D.C. Cir. 2014) ...............................................................................21

*Dep't of Transp. v. Pub. Citizen*,
  541 U.S. 752 (2004) ..................................................................................................11

*Gifford Pinchot Task Force v. U.S. Fish and Wildlife Serv.*,
  378 F.3d 1059 (9th Cir. 2004) .................................................................................25

*Kleppe v. Sierra Club*,
  427 U.S. 390 (1976) ............................................................................................21, 22

*Mall Properties, Inc. v. Marsh*,
  672 F. Supp. 561, 563 (D. Mass. 1987) ..................................................................29

PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT                                          iii
CAUSE NO. 3:19-CV-06071-RJB

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

*MEIC v. U.S. Office of Surface Mining*,
   274 F. Supp.3d 1074 (D. Mont. 2017)..................................................22, 30

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*,
   668 F.3d 1067 (9th Cir. 2011) ............................................10, 11, 13, 14

*Nat'l Parks & Conservation Ass'n v. Babbitt*,
   241 F.3d 722 (9th Cir. 2001) ...............................................17, 18, 21

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
   235 F. Supp.2d 1143 (W.D. Wash. 2002)..................................23, 24

*National Parks Conservation Association v. Semonite*,
   916 F.3d1075 (D.C. Cir. 2019).........................................................19

*Ocean Advocates v. U.S. Army Corps of Engineers*,
   402 F.3d 846 (9th Cir. 2005) ..........................................................18

*Or. Natural Res. Council v. Allen*,
   476 F.3d 1031 (9th Cir. 2007) ...............................................24, 25, 28

*Port of Kalama v. State of Washington*,
   No. 17-2-01269-08 (Super. Ct. Jul. 12, 2018) ...............................5

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989)..........................................................................7

*S. Fork Band Council of W. Shoshone of Nevada v. U.S. Dep't of Interior*,
   588 F.3d 718 (9th Cir. 2009) ....................................................11, 15

*Save the Yaak Comm. v. Block*,
   840 F.2d 714 (9th Cir.1988) ..........................................................21

*Securities & Exchange Comm'n v. Chenery Corp.*,
   332 U.S. 194 (1947).......................................................................25

*Sierra Club v. FERC*,
   867 F.3d 1357 (D.C. Cir. 2017) ...............................................11, 15

*Tennessee Valley Auth. v. Hill*,
   437 U.S. 153 (1978)..........................................................................8

**State Cases**

*Columbia Riverkeeper v. Cowlitz Cnty.*,
   S19-011 (WA Shorelines Hearings Board, Petition for Review, filed Sept. 20,
   2019) ................................................................................................5

PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT     iv
CAUSE NO. 3:19-CV-06071-RJB

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

**Federal Statutes**

5 U.S.C. § 706(2)(A)...................................................................................................9, 14

16 U.S.C. § 1536....................................................................2, 8, 9, 28, 30, 33

33 U.S.C. § 403..........................................................................................................6, 28

33 U.S.C. § 1311(a)........................................................................................................6

33 U.S.C. § 1344................................................................................................3, 4, 6, 29

42 U.S.C. § 4332..............................................................................................................7

**Rules**

Fed. R. Civ. P. 56(c) ........................................................................................................9

**Regulations**

33 C.F.R. 320.4............................................................................................6, 29, 31, 32

33 C.F.R. § 320.1(a) ......................................................................................................28

33 C.F.R. § 322.3.......................................................................................................6, 28

40 C.F.R. § 230.91(c)(2) .................................................................................................6

40 C.F.R. § 1500.2...........................................................................................................7

40 C.F.R. § 1501.4...........................................................................................................7

40 C.F.R. § 1508.7....................................................................................................13, 17

40 C.F.R. § 1508.8(b) ....................................................................................................10

40 C.F.R. § 1508.25............................................................................................13, 21, 22

40 C.F.R. § 1508.27........................................................................7, 17, 18, 20, 21 22

50 C.F.R. § 402.14.................................................................................................8, 23, 25

42 Fed. Reg. 37,122 (1977) ...........................................................................................29

80 Fed. Reg. 26,832 (May 11, 2015) .............................................................................26

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7310*

INTRODUCTION

This case challenges federal permits and approvals for the proposed Kalama Manufacturing and Marine Export Facility, which would be the largest fracked gas-to-methanol refinery and export facility in the world, built on the shores of the Columbia River.  The Kalama Project would take methane from fracked gas produced in the western United States and Canada, turn it into methanol, and ship the methanol to China.  The methanol could be used to produce olefins that will be used as a feedstock for plastics or burned for fuel.  The Kalama Project will have massive greenhouse gas emissions, beginning at the natural gas extraction stage and continuing all the way to its end use as feedstock or fuel.  The refinery alone will use more natural gas each day than all of the power plants in Washington combined; the entire Project will cause more than 2,600,000 tons of greenhouse gases to be released into the atmosphere every year for an estimated 40 years.

The U.S. Army Corps of Engineers ("Corps") issued permits under the Clean Water Act ("CWA") and Rivers and Harbors Acts after undertaking a perfunctory review of environmental impacts under the National Environmental Policy Act ("NEPA") and determining that the Project's benefits outweighed its reasonably foreseeable detriments.  The National Marine Fisheries Service ("NMFS") issued a Biological Opinion pursuant to the Endangered Species Act ("ESA"), reviewing the impacts of the Project on threatened and endangered species.

In its environmental review, the Corps found that the Kalama Project would not have significant environmental impacts requiring preparation of a full environmental impact statement ("EIS") and instead prepared a more truncated environmental assessment ("EA").  It reached this conclusion only by ignoring many of the Project's impacts, most notably greenhouse gas emissions from increased natural gas production and transportation, shipping methanol to China, olefin production, and the use of methanol as fuel.  The Corps considered less than half of the estimated greenhouse gas emissions caused by the Project in its environmental review—the one million tons each year that will come directly from the refining process in Washington State.

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

Worse still, the Corps considered the economic benefits of the refinery in its public interest determination, while omitting its environmental harms, invalidly skewing the balancing.

NMFS's ESA consultation found that the increased shipping would lead to deadly strandings of juvenile salmon and steelhead and ship strikes that would kill sea turtles and orca whales. Yet the Biological Opinion and accompanying Incidental Take Statement ("ITS") set no meaningful limit on this harm to threatened and endangered marine species, despite NMFS's attempt to rationalize its actions after this litigation was filed.

Finally, the Kalama Project would be built near wetlands, natural areas used for recreation, residences, and public spaces whose views would be impaired by industrial towers and pollution. The Corps ignored the Project's detrimental impact on the visual character of the Lower Columbia River and the Kalama region, further undermining its public interest determination.

Plaintiffs Columbia Riverkeeper *et al.* (collectively "Riverkeeper")[1] ask the Court to (1) vacate the EA, CWA and Rivers and Harbors Act permits, and NMFS Biological Opinion and its accompanying ITS (both original and revised); (2) remand to the Corps to prepare an EIS on the Kalama Project before reconsidering new permits; and (3) remand to the Corps and NMFS to re-engage in ESA § 7 consultation on the Kalama Project to produce a valid ITS with take limits that provide a meaningful check on the Project's harm to threatened and endangered species.

---

[1] Plaintiffs' members regularly use and enjoy the Columbia River and areas near the proposed Kalama Project. Each of these conservation and public health organizations has a long and committed history of involvement with Columbia River protection and opposition to this project, including current and prior litigation challenging state permits for the Project. Plaintiffs and their members are harmed by the issuance of the Corps' permit and NMFS Biological Opinion, and the injuries caused by the agencies' violations of law can be remedied by the relief sought in this action. *See* Declarations of Neal Anderson, Lori Ann Burd, John Flynn, Stephanie Hillman, Miles Johnson, Rebecca Ponzio, and Max Savishinsky, filed concurrently.

PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT                    2
CAUSE NO. 3:19-CV-06071-RJB

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

BACKGROUND

I.      THE KALAMA METHANOL PROJECT

The Kalama Project is a proposed methanol manufacturing and export refinery on the shores of the Columbia River.  It has one purpose: to take methane from fracked gas, turn it into methanol, and ship it to China to produce olefins that will be used as a feedstock for plastics or burned as fuel.  COE 13181–82.[2]  It includes a methanol refinery ("Refinery"), a dock and equipment for shipping methanol to China ("Export Terminal"), and a 3.1-mile pipeline to provide fracked gas from the regional pipeline system to the Refinery ("Lateral Project").  ECF 18, Answer, ¶35.  The Corps acknowledged that the Export Terminal and Lateral Project are connected actions under NEPA, do not have independent utility from the Refinery, and would not be built without the Refinery.  COE 13150.

Northwest Innovation Works ("NWIW") proposed building the Refinery and Export Terminal on land leased from the Port of Kalama.  COE 11480, 13171–73.  Unable to finance the Project itself, NWIW applied to the U.S. Department of Energy ("DOE") for a $2 billion loan guarantee to insure its investment in the Refinery.  COE 13150.  DOE was a co-author of the EA and stated that it would rely on the EA to fulfill its NEPA obligations.  COE 13150–51.[3]

The Port owns the upland property where NWIW proposed to build the Refinery.  COE 13171–72.  The Port is simultaneously a project proponent and co-preparer of the related state environmental impact statement and supplemental review under Washington's State Environmental Policy Act ("SEPA").  COE 12537–42.  The Port applied to the Corps for a CWA § 404 permit to dredge and fill the Columbia River and a Rivers and Harbors Act § 10 permit to build the Export Terminal.  COE 13151–63, 13173–74.

A third entity, Northwest Pipeline, proposed building and operating the Latera Project that would transport fracked gas to the Refinery.  ECF 18, Answer, ¶39.  It received a certificate

---

[2] Citations to the Corps and NMFS Administrative Records will be cited as COE [Bates-stamped number] and NMFS [Bates-stamped number], respectively.

[3] Upon information and belief, DOE has not yet acted on NWIW's loan application.

PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT                               3
CAUSE NO. 3:19-CV-06071-RJB

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

of public convenience and necessity from the Federal Energy Regulatory Commission ("FERC") in 2015 authorizing the Lateral Project under the Natural Gas Act. *Id.*; COE 13149. Prior to issuing the certificate, FERC reviewed the environmental impacts of the Lateral Project in a 2015 Environmental Assessment ("FERC EA"). ECF 18, Answer, ¶39; COE 13149, 13177. The Corps was a cooperating agency in the FERC EA. *Id.* Northwest Pipeline applied to the Corps for a separate CWA § 404 permit for the Lateral Project.[4] *Id.*

If constructed, the Refinery would produce up to 3.6 million metric tons of methanol per year and would be the largest fracked-gas-to-methanol refinery in the world. COE 12619. The Refinery would receive fracked gas from the western U.S. and Canada, delivered by the Lateral Project, and convert the gas to methanol by adding steam and a catalyst, then distilling it into a liquid. ECF 18, Answer, ¶40; COE 13171–73. The Refinery would use between 270,000 and 320,000 dekatherms of fracked gas per day, both as the feedstock for methanol production and for the new, onsite 125-megawatt gas-fired electric generating unit that will supply some of the Refinery's significant electricity demand, making it by far the largest single gas user in the state of Washington. Answer, ¶42; COE 13173, 11798. It will also use roughly 100 megawatts of grid electric power, requiring upgrades to the electric transmission lines to the Kalama Project site. *Id.*; COE 7750. An estimated 72 ships per year would take the methanol from the Export Terminal to China for the production of olefins or for use as fuel. COE 13270.

In Washington State alone, emissions associated with the manufacturing process will easily exceed 1,000,000 tons of carbon dioxide equivalent per year. COE 12617, 13260. NWIW and the Port estimate that the Project alone will generate up to an additional 1,600,000 tons of carbon dioxide equivalent per year in upstream natural gas consumption and downstream shipping and olefin production, an estimate that likely significantly underestimates emissions. COE 12617, 13260. NWIW's estimate does not include many indirect effects or emissions,

---

[4] Plaintiffs do not challenge the CWA § 404 permit for the Lateral Project here.

PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT                                4
CAUSE NO. 3:19-CV-06071-RJB

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

1    including a new regional gas pipeline or the combustion of methanol as fuel.  COE 12731,

2    12711–12.

3         In addition to the significant greenhouse gas impacts, the Kalama Project would affect the

4    local environment.  The Refinery and Export Terminal will be built on approximately 90 acres of

5    land along the Columbia River.  This stretch of the river is habitat for endangered and threatened

6    species and provides for local recreation activities and scenic views.  COE 13307–08, 2806,

7    13274–75, 13279–81.

8    II.   STATE COURT CHALLENGES TO ENVIRONMENTAL REVIEWS AND PERMITS

9         To evaluate the greenhouse gas emissions impacts caused by the Kalama Project, the

10   Corps primarily relied on initial and draft supplemental state environmental reviews, despite the

11   fact that a state adjudicatory board, state court, and the Washington Department of Ecology

12   found these reviews inadequate.  COE 13258–60, 13306, 13311–15; *Port of Kalama v. State of*

13   *Washington*, No. 17-2-01269-08, at 5–6 (Super. Ct. Jul. 12, 2018); Northwest Innovation

14   Works—Kalama permitting, *available at* https://ecology.wa.gov/Regulations-Permits/Permits-

15   certifications/Shoreline-permits-enforcement/Northwest-Innovation-Works-Kalama (last visited

16   August 20, 2020) ("Ecology Permit Website").  The Port and Cowlitz County conducted the

17   initial SEPA review for the Kalama Project's state shoreline development permits and submitted

18   an EIS and its recommendation of approval to the Washington Department of Ecology in 2016.

19   COE 7707–13.  Several of the Plaintiffs challenged the state EIS, and the Cowlitz County

20   Superior Court affirmed the state adjudicatory board's rejection of it, finding the guidance on

21   which the EIS relied formulaic and inconsistent with the State's targets for greenhouse gas

22   reductions.  *Port of Kalama*, No. 17-2-01269-08, ¶6.  In response, the Port and County issued a

23   draft supplemental EIS on November 13, 2018, and a final supplemental EIS on August 30,

24   2019.  Ecology Permit Website.  Plaintiffs challenged the final supplemental EIS before the state

25   adjudicatory board for its deficient greenhouse gas emissions analysis, an action that spurred

26   Ecology to find the final supplemental EIS deficient and to commit to prepare its own second

27   supplemental EIS.  *Columbia Riverkeeper v. Cowlitz Cnty.*, S19-011 (WA Shorelines Hearings

28

29   PLAINTIFFS' MOTION FOR
     SUMMARY JUDGMENT                          5
     CAUSE NO. 3:19-CV-06071-RJB

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

1    Board, Petition for Review, filed Sept. 20, 2019); Ecology Permit Website.  Federal Defendants

2    were aware of the litigation and received from Plaintiffs related communications between

3    Ecology, NWIW, and the Port.  ECF 18, Answer, ¶50.

4           Although the Corps tracked the progress of the state reviews, it did not wait for resolution

5    of these greenhouse gas emissions disputes.  Instead, the Corps' analysis of greenhouse gas

6    impacts relied on the <u>inadequate</u> 2016 EIS and <u>draft, inadequate</u> 2018 supplemental EIS.  COE

7    13260, 13292, 13311, 13314–15.

8    III.    THE CORPS' REVIEW AND PERMITS

9           The proposed Kalama Project would be built on and near the Columbia River,

10   necessitating permits from the Corps under the CWA and Rivers and Harbors Act.  Before

11   issuing these permits, the Corps was required to review the environmental impacts of the Project

12   under NEPA and ensure that the Project will not jeopardize endangered and threatened species

13   through consultation with NMFS under the ESA.

14          A.      The Clean Water Act and Rivers and Harbors Act

15          Section 404 of the Clean Water Act requires a Corps permit to discharge dredged or fill

16   material into waters of the United States.  33 U.S.C. §§ 1311(a), 1344(a)–(e).  The Rivers and

17   Harbors Act requires a Corps permit to build an overwater structure in navigable waters.  33

18   U.S.C. § 403.  The Corps issues individual permits on a case-by-case basis after taking "all

19   appropriate and practicable steps to avoid and minimize adverse impacts to waters of the United

20   States."  *Id.*, § 1344(a); *see also* 40 C.F.R. § 230.91(c)(2).  The Corps must, among other things,

21   prepare site-specific documentation and analysis of waters and wetlands and potential effects to

22   them, conduct a public interest analysis, and make a formal determination pursuant to the

23   statutory and regulatory criteria.  33 C.F.R. § 322.3, Parts 323, 325.  The public interest factors

24   include, among others, conservation, economics, aesthetics, general environmental concerns, air

25   quality, fish and wildlife values, and recreation.  33 C.F.R. § 320.4.

26

27

28

29   PLAINTIFFS' MOTION FOR
     SUMMARY JUDGMENT                          6
     CAUSE NO. 3:19-CV-06071-RJB

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

1

2      B.      The National Environmental Policy Act

3          NEPA requires all federal agencies to take environmental considerations into account in

4   their decision-making "to the fullest extent possible."  42 U.S.C. § 4332; 40 C.F.R. § 1500.2.[5]

5   NEPA requires federal agencies to prepare an EIS before undertaking any "major federal action

6   significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C); 40

7   C.F.R. § 1501.4.  The purpose of an EIS is to inform the decision-makers and the public of the

8   significant environmental impacts of the proposed action, means to mitigate those impacts, and

9   reasonable alternatives that will have lesser environmental effects.  *Robertson v. Methow Valley*

10  *Citizens Council*, 490 U.S. 332, 349 (1989).

11         Whether an action will cause significant adverse effects requires considerations of

12  context ("society as a whole (human, national), the affected region, the affected interests, and the

13  locality") and intensity ("severity of the impact," including consideration of ten listed factors).

14  40 C.F.R. § 1508.27.  An agency cannot avoid a determination of significance by breaking the

15  project down into small component parts.  *Id.*  If the agency finds that the project has no

16  significant adverse environmental effects, it may skip a full EIS and prepare a simpler

17  Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI").  40 C.F.R.

18  § 1501.4(e).

19         The Corps prepared an EA/FONSI for the Kalama Project on January 18, 2019, and

20  issued permits for the Export Terminal on April 1, 2019.  COE 13150.  The scope of review

21  includes the entire Kalama Project, including the Refinery.  COE 13178.  The Corps was able to

22  reach a finding of no significant impacts because it ignored the impacts of greenhouse gas

23  emissions outside of Washington documented in the state environmental reviews; disregarded

24  the highly controversial nature of the Project's environmental impacts, evidenced by the series of

25  supplemental environmental reviews required by Ecology and state courts; overlooked the

26

27  [5] In July 2020, the Council on Environmental Quality issued revised NEPA regulations; the
    Corps' review of this Project used and applied the prior NEPA regulations.

28

29  PLAINTIFFS' MOTION FOR
    SUMMARY JUDGMENT                         7
    CAUSE NO. 3:19-CV-06071-RJB

*Earthjustice*
810 Third Ave., Suite 610
Seattle, WA  98104
(206) 343-7340

1   unique characteristics of the geographic area, including wetlands, scenic areas, recreation, and

2   habitat; failed to appropriately limit harm to threatened and endangered species; and improperly

3   segmented the Kalama Project to avoid applying the adverse effects from the Refinery to grant a

4   permit for the Export Terminal.

5           C.      The Endangered Species Act

6           The Endangered Species Act of 1973 is "the most comprehensive legislation for the

7   preservation of endangered species ever enacted by any nation." *Tennessee Valley Auth. v. Hill*,

8   437 U.S. 153, 180 (1978).  A review of the Act's "language, history, and structure" convinced

9   the Supreme Court "beyond a doubt" that "Congress intended endangered species to be afforded

10  the highest of priorities." *Id.* at 174.

11          The heart of the ESA's protective scheme is section 7, which requires that every federal

12  agency "shall, in consultation with and with the assistance of the Secretary, insure that any action

13  authorized, funded, or carried out by such agency … is not likely to jeopardize the continued

14  existence of any endangered or threatened species." 16 U.S.C. § 1536(a)(2).  To ensure

15  compliance with this mandate, federal agencies must consult with the appropriate expert fish and

16  wildlife agency—NMFS in the case of marine species and anadromous fish—whenever their

17  actions "may affect" an endangered or threatened species.  *See* 50 C.F.R. § 402.14.

18          The end product of formal ESA consultation is a biological opinion in which NMFS

19  determines whether the action will jeopardize the survival of listed species or will adversely

20  modify the species' critical habitat, and, if so, what reasonable and prudent alternative ("RPA")

21  is available to avoid such a result.  16 U.S.C. § 1536(b).  NMFS has a statutory duty to use the

22  best available scientific information in an ESA consultation.  16 U.S.C. § 1536(a)(2).

23          If NMFS concludes that the proposed action is not likely to jeopardize listed species or

24  critical habitat, the biological opinion must include an incidental take statement ("ITS")

25  specifying the authorized "amount or extent" of take incidental to the proposed action,

26  "reasonable and prudent measures" necessary or appropriate to minimize take, and the "terms

27  and conditions" with which the action agency must comply to implement any reasonable and

28

29  PLAINTIFFS' MOTION FOR
    SUMMARY JUDGMENT                    8
    CAUSE NO. 3:19-CV-06071-RJB

*Earthjustice*
810 Third Ave., Suite 610
Seattle, WA  98104
(206) 343-7340

prudent measures.  16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).  ITS's "are integral parts of the statutory scheme, determining, among other things, when consultation must be reinitiated." *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1251 (9th Cir. 2001).

Here, although NMFS found that the Project would harm protected species, it concluded in the Biological Opinion that the proposed action was not likely to jeopardize populations of salmon, steelhead, eulachon, and leatherback sea turtles, or destroy or adversely modify their critical habitat.  NMFS 37311.  The ITS that NMFS provided to the Corps did not specify the numerical amount of take allowed, instead the ITS used surrogate habitat indicators as incidental take limits.  NMFS 37313.  Yet the habitat indicators for endangered and threatened fish were coextensive with the proposed impacts of the entire Kalama Project.  Accordingly, the ITS purported to allow all incidental take the Project could cause, stemming from the amount of overwater coverage that the new dock would create, the number of pile strikes it would take to build the dock, the area of the river that will be dredged, and the number of vessels that would travel up and down the Columbia River and through the Pacific Ocean each year.  *Id.*  The ITS originally set no limits for take of leatherback sea turtles from ship strikes, but after this litigation commenced, NMFS added a take limit equal to the number of expected vessel trips per year for ship strikes with leatherback sea turtles.  NMFS 12.  NMFS set no take limits for Southern Resident killer whales.  NMFS 37317–18.

## STANDARDS OF REVIEW

Summary judgment is appropriate where the moving party shows that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  Under the Administrative Procedure Act ("APA"), this Court must vacate the agency decisions if it finds the decision "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *see Conner v. Burford*, 848 F.2d 1441, 1453 (9th Cir. 1988).  "Agency decisions may not, of course, be inconsistent with the governing statute."  *Defenders of Wildlife v. U.S. Envtl. Prot. Agency*, 420 F.3d 946, 959 (9th Cir. 2005) (instructing courts to "set aside" agency action "not in accordance with law").

PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT                    9
CAUSE NO. 3:19-CV-06071-RJB

ARGUMENT

I.    THE CORPS IGNORED THE INDIRECT AND CUMULATIVE GREENHOUSE GAS
      IMPACTS CAUSED BY THE KALAMA PROJECT.

The Corps' truncated EA concluded that building and operating a giant petrochemical refinery and export terminal on the Columbia River estuary would not cause significant environmental impacts.  The Corps reached this illogical conclusion by, among other errors, ignoring the massive indirect greenhouse gas emissions the proposal would cause.  The Corps' narrow review excluded significant upstream greenhouse gas emissions from natural gas transportation, as well as downstream emissions from olefin production and combustion of methanol as fuel.  Instead, the Corps limited its analysis to the greenhouse gas emissions within the borders of Washington, a meaningless geographic limitation on a project with far-reaching impacts.  NEPA requires more.  It forces agencies, like the Corps, to consider and disclose the "reasonably foreseeable" effects of a proposed action, even if those effects occur "later in time or farther removed in distance." 40 C.F.R. § 1508.8(b); *N. Plains Res. Council, Inc. v. Surface Transp. Bd.,* 668 F.3d 1067, 1073–74, 1081–82 (9th Cir. 2011).

The Kalama Project will cause massive greenhouse emissions from increased gas extraction, leaks from transporting natural gas, powering the Refinery, the manufacturing process, shipping methanol to China, producing olefins, and combustion of methanol as fuel. The manufacturing process alone will emit at least 1,000,000 tons of greenhouse gas each year.[6] And the production and transportation of fracked gas to the Refinery, together with shipping methanol and olefin production, will emit up to at least another 1,600,000 tons of greenhouse

---

[6] The Corps relied on mitigation to make its finding of no significant impacts, but NWIW's agreement to purchase mitigation credits and contribute to a mitigation bank was voluntary, in violation of NEPA's requirements that the agency can ensure the mitigation will actually be performed.  COE 13311, 13314-15, 12561; Council on Environmental Quality, Appropriate Use of Mitigation and Monitoring and Clarifying the Appropriate Use of Mitigated Findings of No Significant Impact (Jan. 14, 2011), available at: https://ceq.doe.gov/docs/ceq-regulations-and-guidance/Mitigation_and_Monitoring_Guidance_14Jan2011.pdf (last accessed July 28, 2020).

PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT                    10
CAUSE NO. 3:19-CV-06071-RJB

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

gases each year.[7]  On top of these direct and indirect emissions, the Kalama Project will induce construction of a new pipeline and will sustain a market that uses methanol as fuel.  The Corps considered only the direct greenhouse gas emissions from the manufacturing process and the impacts of greenhouse gases in Washington.

NEPA required the Corps to consider the indirect effects of the Kalama Project that were reasonably foreseeable, including the upstream induced construction of a new pipeline and increased fracking activity, as well as the downstream greenhouse gas emissions from shipping methanol, producing olefins, and using methanol as fuel.  *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 754 (2004).  Impacts are foreseeable if they are "sufficiently likely to occur that a person of ordinary prudence would take [them] into account in reaching a decision."  *Sierra Club v. FERC*, 867 F.3d 1357, 1371 (D.C. Cir. 2017).  The failure to consider such indirect effects renders the environmental analysis inadequate.  *Id.* at 1379.  For example, the Ninth Circuit has held that upstream coal mines and coal-fired power plants were an indirect and cumulative impact of proposed rail lines transporting coal where the agency used the coal from those mines to justify the financial soundness of the rail lines.  *N. Plains Res. Council, Inc. v. Surface Transp. Bd.,* 668 F.3d 1067, 1082 (9th Cir. 2011).  Likewise, the Ninth Circuit has vacated agency actions for failure to consider the downstream emissions of a mining project because "[the agency] did not take the requisite hard look at the environmental impacts of the proposed project."  *S. Fork Band Council of W. Shoshone of Nevada v. U.S. Dep't of Interior*, 588 F.3d 718, 726 (9th Cir. 2009).

The D.C. Circuit in *Sierra Club v. FERC* held that downstream greenhouse gas emissions from burning natural gas at a power plant were reasonably foreseeable environmental effects of interstate pipelines and needed to be considered in balancing the public interest.  *Sierra Club*, 867 F.3d at 1372–73.  The same reasoning applies here.  The Corps is obligated to balance the

---

[7] Plaintiffs believe this estimate from the state environmental review significantly underestimates the actual greenhouse gas emissions that will be caused by the Project.

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

public interest under the Clean Water Act and must specifically consider greenhouse gas emissions, so it may deny a permit based on the emissions from reasonably foreseeable impacts.

A.    NWIW's Gas Consumption Will Require Building a New Regional Fracked Gas Pipeline.

Individually or cumulatively, the gas consumption from NWIW's methanol projects would exceed the capacity of the existing regional gas pipeline system.  To make methanol, the Kalama Project would consume 320,000,000 cubic feet of gas daily—more than every gas-fired power plant in Washington combined.  COE 14484–85.  NWIW's other nearby methanol proposal at Port Westward would use 160,000-320,000 dekatherms per day. COE 7090. This level of gas consumption, individually or cumulatively, would quickly exceed the capacity of existing pipelines in the Pacific Northwest and require building another regional gas pipeline.

The Corps was aware of, but did not evaluate, the effects of a new regional gas pipeline. Williams—the owner of the regional pipeline system and the parent company of the proponent of the Lateral Project—has been considering a new regional pipeline for a long time.  Since at least 2015, industry studies reported Williams' proposal for a new pipeline named the "Sumas Express" or "Washington Expansion Project," which would run parallel to Northwest Pipeline's existing pipelines along the Interstate-5 corridor, approximately from Bellingham to Olympia, serving Washington and Oregon.  COE 14564; 14577.

The Kalama Project's demand for gas, by itself, is enough to move this second regional pipeline forward.  NWIW was aware of, and did not report in environmental reviews, that the Kalama refinery's fracked gas consumption would utilize all capacity in the existing regional pipeline and, in the near future, require building a new one.  COE 14484–14598.  Because the existing pipeline already has high utilization, any large project requiring 150,000 dekatherms per day (less than half of NWIW's proposed consumption in Kalama) would be enough to trigger pipeline expansion.  COE 14592.  To ensure near-term supply, NWIW proposed leasing existing pipeline capacity from another entity for about three years until the new pipeline could be built. COE 14485.  NWIW did not disclose that it was shopping around for short-term capacity to wait

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

out the necessary construction of a new pipeline, but Riverkeeper notified the Corps of this situation in September 2016, well in advance of the Corps' issuance of the final EA and permit in January 2019.[8]  COE 14484–14598. Accordingly, construction of a second regional gas pipeline is a reasonably foreseeable indirect effect of the Kalama refinery.  *See Northern Plains Resource Council*, 668 F.3d at 1073–74, 1081–82 (holding that coal mines and coal-fired power plants were reasonably foreseeable impacts of a new coal-hauling railroad when, among other things, plaintiffs' comments notified the agency of these impacts).  The Corps' decision to ignore this indirect impact violates NEPA.

Even if the Kalama Project alone would not result in a new regional gas pipeline (and it would), the cumulative gas consumption by NWIW's two proposed methanol refineries at Kalama and Port Westward would require a second regional pipeline.  Accordingly, a new regional pipeline is among the Kalama Project's cumulative impacts.  *See* 40 C.F.R. § 1508.25(c)(3).  A cumulative impact is an "impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions . . . ."  *See* 40 C.F.R. § 1508.7.  Here, Williams reports that on a typical day, the existing pipeline system can deliver 500,000 dekatherms per day to the Kalama area.  COE 14613–14.  The Kalama Project would use 320,000 dekatherms per day and NWIW's other nearby methanol proposal at Port Westward would use between 160,000 to 320,000 dekatherms per day.  COE 7090–92.  This is more than the existing pipeline could supply, even if no one in Southwest Washington besides NWIW needed gas.  Because the combined effect of NWIW's two proposals alone would require the construction of a new regional gas pipeline, such pipeline is a cumulative impact of the Kalama Project.  The Corps' decision to ignore this cumulative impact violates NEPA.

---

[8] In response to Riverkeeper's September 2016 letter to the Corps, Williams responded to the Corps that the Kalama Project would not need additional infrastructure because it entered into a contract for firm and interruptible gas transportation for 320,000 dekatherms per day for twenty-five years.  COE 14613-14.  That description of the contract suggests only that NWIW has priority and does not address the supply constraints on peak days that are estimated to have shortfalls beginning around 2021.  COE 14571.

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

In *Northern Plains Resource Council*, the Ninth Circuit held that the Surface Transportation Board failed to comply with NEPA when it approved new coal railroad lines without considering the environmental effects of associated proposed coal mines and coal-fired power plants.  668 F.3d at 1073–74, 1081–82.  In so holding, the appellate court found that the coal mines and power plants were reasonably foreseeable effects of the railroad because (1) plaintiff notified the Board of these effects in public comments, (2) the federal government transferred the land to the state specifically for coal extraction, and (3) the Board knew the coal from those mines would be transported on the railroad lines at issue and used it to justify the financial soundness of the railroad lines.  *Id.* at 1081–82.

Here, Riverkeeper notified the Corps of the new pipeline and provided industry studies and evidence that NWIW would exceed the limits of the existing pipeline such that it would induce construction of a new pipeline with its own environmental impacts.  Likewise, the Corps knew or had available information from state environmental reviews that Kalama's increased consumption of fracked gas would measurably increase greenhouse gas emissions from the pipeline and increased fracking activity.

B.      The Kalama Project Will Create Significant Greenhouse Gas Emissions from Shipping Methanol to China, Producing Olefins, and Using Methanol as Fuel.

The Corps' analysis also ignored the Kalama Project's foreseeable downstream greenhouse gas emissions.  The Corps was aware of, and ignored, public comments and state environmental review documents describing greenhouse gas emissions resulting from shipping methanol to China (on 72 round trips each year), olefin production, and burning methanol as fuel.  COE 12713–14.  Despite abundant evidence of downstream impacts, the Corps only addressed the impacts in Washington State.  COE 13311–15.  Because the downstream greenhouse gas emissions were foreseeable, the Corps' omission was arbitrary, capricious and contrary to law.  5 U.S.C. § 706(2)(A).

The Corps cannot ignore what happens after the methanol leaves the dock in Kalama. The downstream effects are not merely "foreseeable;" they are part of the explicit purpose of this

PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT                    14
CAUSE NO. 3:19-CV-06071-RJB

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

petrochemical export project.  In an analogous case involving the expansion of a gold mine, the Ninth Circuit held that the Bureau of Land Management should have analyzed the downstream air quality impacts from transporting more ore from the gold mine to a processing facility.  *South Fork Band of Western Shoshone of Nevada*, 588 F.3d at 726.  In *Sierra Club v. FERC*, the D.C. Circuit required FERC to consider the downstream emissions that would result from constructing a pipeline to deliver gas to gas-fired power plants.  867 F.3d at 1371.  Here, NEPA requires the Corps to study and disclose the greenhouse gas emissions that will occur downstream: when methanol is shipped to China, when it is turned into olefins, and when it is burned as fuel.  The Corps cannot ignore these effects; its failure to do so violates NEPA.

In fact, the Corps tacitly acknowledged these emissions would occur—albeit while parroting NWIW's unsubstantiated "market displacement" theory.  COE13311; 13314.  The state environmental reviews estimated an additional 1,600,000 tons of greenhouse gas emissions each year that the Corps simultaneously ignored and claimed as a benefit of the Kalama Project.  *Id.* Even if the Corps had considered them, the analysis likely underestimated their true value and downplayed their environmental impacts by comparing them to petroleum and coal inputs.[9]  To the extent that the Corps considered the downstream greenhouse gas emissions beyond Washington State, it claimed that methanol-to-olefin production would displace coal-to-olefin production because it assumed without explanation the cost advantages from fracked gas would fully displace coal inputs for olefin production.  COE 13311; 13314.  It is arbitrary and capricious for the Corps to rely on NWIW's un-verified claims about the project's indirect impact on global GHG emissions while simultaneously pretending that downstream emissions

---

[9] The draft supplemental state review superficially addressed these emissions.  It included downstream emissions that "result from the combustion of fuel used for methanol transport." COE 12721.  It estimated the emissions from methanol to olefin production, but compared them to petroleum to methanol production to make the case for methanol.  COE 12759.  It assumed with little analysis that methanol would replace petroleum and coal as inputs.  COE 12760–61, 12765.  It also briefly addressed the benefits of methanol as fuel, without analyzing whether additional methanol production would increase or continue reliance on fossil fuels.  COE 12753–54; 12711–12.

PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT                    15
CAUSE NO. 3:19-CV-06071-RJB

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

resulting directly from the transport and use of NWIW's methanol were not "reasonably foreseeable." COE 13311–15. The Corps cannot have it both ways.

C.    The Corps Failed to Consider the Cumulative Impacts of the Kalama Project's Greenhouse Gas Emissions and Other Reasonably Foreseeable Fossil Fuel Projects.

In recent years, various companies have proposed or begun shipping fossil fuels—including crude oil, coal, methanol, liquefied propane gas, and liquefied natural gas—through the Columbia River Estuary. COE 2808. In reviewing the cumulative impacts of greenhouse gas emissions from some of these related fossil fuel projects in the area, the Corps provided no reasoning or analysis. It merely listed projects in a table of "Reasonably Foreseeable Future Action," and then made the following conclusion:

> When considering the overall impacts that will result from the proposed activity, in relation to the overall impacts from past, present, and reasonably foreseeable future activities, the incremental contribution of the proposed activity to cumulative impacts in the area described in section 9.2, are not considered to be significant.

COE 13312-13, 13315. The Corps did not describe how it identified these projects, but the list appears to be a subset of those in the 2016 State EIS.[10] COE 4149–52. The Corps made no other mention of the cumulative impacts of these projects, and did not otherwise analyze their impacts, except to note that the proposed project would "cumulatively increase the volume of greenhouse gases in the atmosphere." COE 13306. While several listed projects have been canceled or withdrawn, Port Westward, another methanol export terminal proposed by NWIW, was not listed, even though it was identified to the Corps. COE 13313, 2808.

---

[10] The State EIS explanation does not save the Corps' failure to analyze cumulative impacts. Instead of analyzing any of the listed projects' impacts, the State EIS dismissed these projects as speculative and pointed to the retirement of fossil fuel projects and the state of Washington's successes in reducing greenhouse gas emissions and its legislative targets for reductions to claim that it would not have any cumulative impacts. It is counterintuitive to allow a fossil fuel project to move forward and increase greenhouse gas emissions on the basis that the State is seeking greenhouse gas reductions and getting results.

PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT                    16
CAUSE NO. 3:19-CV-06071-RJB

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

The Corps cannot ignore the cumulative contribution of this project, and others like it, to increased greenhouse gas emissions and climate change.  NEPA requires a quantification of the "incremental impact[s] that [the proposed project's] emissions will have on climate change … in light of other past, present, and reasonably foreseeable actions."  *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1216 (9th Cir. 2008); *see also Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 508 F.3d 508, 550 (9th Cir. 2007) ("The impact of greenhouse gas emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct.").  Even if the Corps could find that the Kalama Project would have an "individually minor" effect on the environment—a finding it could not make, given the magnitude of the Project's impact—it must consider the effect of similar projects with "collectively significant actions taking place over a period of time" that contribute significantly to climate change.  40 C.F.R. § 1508.7.  NEPA requires analysis of the "actual environmental effects" resulting from those cumulative emissions.  *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d at 1216.

## II.    THE CORPS FAILED TO PREPARE AN ENVIRONMENTAL IMPACT STATEMENT TO EVALUATE THE PROJECT'S SIGNIFICANT EFFECTS.

The Corps incorrectly concluded that the Kalama Project would not involve "significant" environmental impacts requiring a full EIS.  Whether a federal action significantly impacts the environment such that the agency must prepare an EIS requires consideration of context and intensity.  *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 731 (9th Cir. 2001); 40 C.F.R. § 1508.27.  Context means the region or locale and affected interests.  *Id.*  Intensity is the severity of the impact or the "the degree to which the agency action affects the locale and interests identified in the context part of the inquiry."  *Id.*

NEPA lists ten factors to consider in evaluating intensity.  40 C.F.R. § 1508.27.  The intensity factors the Corps should have considered include (1) the degree to which the environmental effects are highly controversial; (2) the unique characteristics of the geographic area, including wetlands, scenic areas, recreation, and habitat; and (3) the impacts to endangered

PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT                                    17
CAUSE NO. 3:19-CV-06071-RJB

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

1   species.  40 C.F.R. § 1508.27.  Any one of these factors is sufficient to warrant preparation of an

2   EIS in appropriate circumstances.  *NPCA v. Babbitt*, 241 F.3d at 731.  The Corps also improperly

3   segmented Project review to avoid a finding of significant impacts that would trigger the

4   requirement to produce a full EIS.

5        Plaintiffs challenging an agency's failure to prepare an EIS need only raise substantial

6   questions about whether the project would have a significant effect.  *Ocean Advocates v. U.S.*

7   *Army Corps of Engineers*, 402 F.3d 846, 864-65 (9th Cir. 2005) (requiring an EIS to consider

8   increased tanker traffic as a consequence of extending an oil refinery dock at Cherry Point,

9   Washington).  If an agency opts not to prepare an EIS, it must put forth a "convincing statement

10  of reasons" that explains why the project will not significantly impact the environment to satisfy

11  the agency's requirement to take a "hard look" at the potential impacts.  *Id.* (finding the Corps'

12  statement of reasons conclusory).

13       A.    The Kalama Project's Environmental Effects Are Highly Controversial.

14       The Corps relied on state environmental reviews for much of its analysis of the Kalama

15  Project, and yet ignored the controversial nature of the project's environmental impacts,

16  evidenced by the ongoing review by the Department of Ecology and the pending challenge in

17  state courts by several plaintiffs in this litigation.  Instead of waiting for a final version of a draft

18  supplemental environmental impact statement, which it knew was a product of failures of the

19  first EIS to address greenhouse gas impacts, it proceeded with its own determination of no

20  significant impacts, basing its findings on that draft.  By failing to produce a full EIS, the Corps

21  got it wrong.  Ecology's finding of inadequate greenhouse gas emission review, in addition to the

22  prior findings of the state adjudication board and state court, easily met the significance

23  threshold.  *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir.

24  1998) (holding that an EIS was required when an EA raised "substantial questions" about

25  whether an agency's action will have a significant effect on the quality of the human

26  environment).

27

28

29  PLAINTIFFS' MOTION FOR
    SUMMARY JUDGMENT                                    18
    CAUSE NO. 3:19-CV-06071-RJB

*Earthjustice*
810 Third Ave., Suite 610
Seattle, WA  98104
(206) 343-7340

1      In *National Parks Conservation Association v. Semonite*, the D.C. Circuit found unlawful

2  a Corps' determination that electrical transmission lines through an historic area did not involve

3  sufficiently significant impacts to warrant an EIS.  916 F.3d 1075, 1082 (D.C. Cir. 2019).  There,

4  the Court found that robust technical criticism from entities with "special expertise" triggered a

5  finding that the action was "controversial" under NEPA.  *Id.* ("If such comments, representing

6  just a small sample of the many criticisms in the record, do not cast substantial doubt on the

7  adequacy of the Corps' methodologies, then we are unsure what would.") (internal citations

8  omitted).  The decision cited "repeated criticism from many agencies who serve as stewards of

9  the exact resources at issue, not to mention consultants and organizations, with on-point

10  expertise." *Id.* at 1085.

11      Here, the Department of Ecology—the state agency approving permits for the Kalama

12  Project based on the state EIS—found the first supplemental greenhouse gas analysis inadequate

13  and committed to prepare a second supplemental EIS to include a more robust lifecycle analysis

14  of the project's greenhouse gas emissions, and a more detailed assessment of the environmental

15  impacts caused by those emissions.  As discussed, several plaintiffs in this case successfully

16  challenged the first state EIS with evidence challenging the greenhouse gas analysis.  The

17  Shoreline Hearings Board—the adjudicatory board charged with resolving challenges to the state

18  permits sought for the Kalama Project—decided once that the greenhouse gas emissions analysis

19  failed to meet the requirements of the State's greenhouse gas reduction targets and required a

20  broader consideration of the project's greenhouse gas impacts.  It is hearing the challenge again

21  for compliance with its earlier order.  The Corps cannot ignore these findings.  Given the

22  controversy of state environmental reviews on which the Corps bases most of its greenhouse gas

23  opinions, it is required to prepare an EIS.

24      B.     The Kalama Project's Geographic Area Has Unique Wetland, Scenic Areas,
               Recreation, and Habitat Characteristics.

25

26      In evaluating the environmental impacts of the project, the Corps overlooked the unique

27  characteristics of the geographic area required by NEPA's significance test, including wetlands,

28

PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT                    19
CAUSE NO. 3:19-CV-06071-RJB

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

scenic areas, recreation, and habitat.  40 C.F.R. § 1508.27(b)(3).  The Corps narrowly focused on

Cowlitz County's comprehensive plan designating the specific Port land as heavy industrial land.

COE 13173–74.  The Corps uses this designation as a basis for its conclusion that the Kalama

Project would not impact the unique characteristics of the geographic area.  COE 13257–58.

This is not the case.  While the Port's property itself is cleared and is nearby other industrial

facilities including the Steelscape dock, aerial views of the site show that the Port's property is

surrounded by the natural features of the Columbia River watershed.  COE 7918, 7925, 8064,

8074, 8077.  It borders the Columbia River on its west side and wetlands to its north and east, on

the opposite side of the street that borders the property Tradewinds Road.  COE 7776.  Zooming

out from the aerial photo of the property, the landscape around the property appears relatively

undisturbed.  Johnson Declaration, ¶6.

The proposed site for the Refinery and Export Terminal is on the shore of the Columbia

River estuary, an area at the center of a regional and national effort to restore endangered and

threatened salmonids.  COE 2806, 2811–12.  The Columbia River estuary is a federally-

designated Estuary of National Significance under the Clean Water Act's National Estuary

Program.  *Id.*  In 2006, the U.S. Environmental Protection Agency ("EPA") designated the

Columbia River as one of seven Priority Large Aquatic Ecosystems.  *Id.*  The Columbia River

estuary is essential to the survival juvenile salmon and steelhead, waterfowl, and many other

species.  *Id.*  Public and private entities have invested billions of dollars to restore endangered

and threatened salmonids in the Columbia River Basin.  *Id.*  This includes significant investment

in riparian and wetland restoration projects in the estuary.  *Id.*  NMFS has described the

ecological value of the Columbia River estuary, stating:

> The lower Columbia River estuary provides vital habitat for anadromous
> salmonids throughout the Columbia River basin, and is of particular importance
> from a threatened and endangered species recovery perspective. The estuary is
> designated as critical habitat for 17 species of ESA-listed fish and EFH [Essential
> Fish Habitat] for Pacific salmon.

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

*Id.*  The federal government has funded—and will continue to fund for the foreseeable future—a significant portion of the salmon restoration efforts in the Columbia River estuary.  These are the kind of unique characteristics that the Ninth Circuit in *NPCA v. Babbitt,* found were "undisputed" and of "overwhelming importance" in analyzing whether increased cruise ship traffic would have significant impacts on the environment.  241 F.3d at 731.

C.  The Kalama Project Harms Threatened and Endangered Species.

The Corps also failed to appropriately consider the impacts from the Kalama Project to endangered and threatened species, including populations of salmon, eulachon, steelhead that have critical habitat in project area and leatherback sea turtles and Southern Resident killer whales that are at risk of ship strikes from vessels transiting out to the ocean at the mouth of the Columbia River.  As discussed below, NMFS set incidental take limits that allow full project implementation instead of setting limits based on the survival of the species, and the Corps adopted terms and conditions into its permits relying on those project-based take limits.

D.  The Corps Failed to Consider the Kalama Project's Full/Non-Segmented Impacts.

The Corps improperly segmented its analysis of the Refinery, Export Terminal, and the Lateral Project to avoid applying the adverse effects of the Kalama Project—as a whole—as consequences of issuing a permit to the Export Terminal, thereby avoiding a finding that the adverse impacts to the human environment are significant for the Export Terminal.  NEPA prohibits exactly this kind of review.  40 C.F.R. §§ 1508.25(a)(1)(ii), (iii) (connected actions "cannot proceed unless other actions are taken previously or simultaneously," and "are interdependent parts of a larger action and depend on the larger action for their justification), 1508.27(b)(6), (7); *Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976) (connected actions should be reviewed in a single EIS).  When agency actions have the potential for cumulative harm, the agency must consider connected actions together even if the impact of a single proposed action is not significant.  *Save the Yaak Comm. v. Block*, 840 F.2d 714, 720 (9th Cir.1988) (finding road construction and timber harvest were connected actions under NEPA).  *Delaware Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313–20 (D.C. Cir. 2014) (holding FERC violated NEPA and

PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT                    21
CAUSE NO. 3:19-CV-06071-RJB

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

failed to analyze cumulative impacts by preparing an EA/FONSI for one of four pipeline

segments that was physically, temporally, and functionally interdependent to three others).  More

recently, a district court in Montana found that the federal agency failed to take a hard look at the

effects of coal transportation, non-greenhouse gas emissions, and the cost of greenhouse gas

emissions from coal combustion.  *MEIC v. U.S. Office of Surface Mining*, 274 F. Supp.3d 1074,

1090–99 (D. Mont. 2017).  The court held that because the agency acted arbitrarily and

capriciously by failing to take a hard look at those impacts, the decision not to do an EIS—that

is, the agency's evaluation of context and intensity—was arbitrary and capricious as well.  *Id.* at

1101, 1103.

The Corps acknowledged that the Refinery, Export Terminal and Lateral Project are

connected actions and do not have independent utility from the Refinery and would not be built

without the Refinery.  Together with DOE and FERC as cooperating agencies, it prepared a

single EA to consider the component projects together, as required by NEPA regulations and

longstanding case law.  COE 13150; 40 C.F.R. §§ 1508.25, 1508.27; *Kleppe*, 427 U.S. at 410.

Yet, as discussed below, the Corps ignored the Refinery's negative impacts when reviewing the

Export Terminal and Lateral Project under the Clean Water Act public interest review factors

and balanced the factors to support the project.

III.   NMFS FAILED TO SET TAKE LIMITS FOR ENDANGERED AND THREATENED
       SPECIES OF SALMON, SEA TURTLES, AND SOUTHERN RESIDENT KILLER
       WHALES.

An ITS is intended to provide a means for monitoring the effects agency actions,

ensuring that take does not exceed a level that would jeopardize listed species.  Here, however,

NMFS failed to specify the actual impacts of the Project on threatened populations of salmon,

eulachon, steelhead, sea turtles, and Southern Resident Killer Whales, instead allowing take

coextensive with the scope of the Project, which fails to provide the necessary trigger to alert the

Corps that anticipated impacts have been exceeded and consultation must be reinitiated to

prevent jeopardy.  For Southern Resident Killer Whales, the ITS provided no take limit at all.

PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT                               22
CAUSE NO. 3:19-CV-06071-RJB

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

1   Simply put, the ITS cannot fulfill its central function of providing a check against unacceptable

2   levels of harm to already imperiled species.

3       A.   The Incidental Take Statement Unlawfully Used Take Surrogates That Are
             Coextensive with the Scope of the Project.

4

5       While NMFS concluded that the Kalama Project will result in take of threatened salmon,

6   eulachon, sea turtles, and Southern Resident Killer Whales, it issued an ITS that does not provide

7   a specific number of individuals of these species that may be taken, as the ESA requires.  50

8   C.F.R. § 402.14(i).  Instead, NMFS used surrogate incidental take limits for species affected by

9   vessel traffic (*i.e.*, wake stranding and ship strikes) equal to the number of vessel trips proposed

10  for the Project.  NMFS 37313.  It likewise set surrogate incidental take limits from construction

11  of the dock equal to the number of pile strikes per year and set limits for take caused by

12  overwater predation equal to the area of the proposed dock.  *Id.*  The take surrogates in the ITS

13  are entirely coextensive with the scope of the Project.

14      "Incidental Take Statements set forth a 'trigger' that, when reached, results in an

15  unacceptable level of take, invalidating the safe harbor provision, and requiring the parties to re-

16  initiate consultation."  *Arizona Cattle Growers' Ass'n*, 273 F.3d at 1249.  As a factual matter,

17  using the scope of the proposed project as the take surrogate in the ITS, without any connection

18  to the resulting take of species, does not reveal anything about whether the amount or extent of

19  take would result in jeopardy, let alone provide a meaningful measure to ascertain whether that

20  amount has been exceeded requiring reinitiation of consultation.  By failing to specify an

21  objective measure of the allowable take, the ITS failed to achieve its mandated function.

22      Indeed, an "ITS cannot be effective in its purpose if there is no such 'trigger' to require

23  the agency to reconsider its approval of incidental take."  *Nat'l Wildlife Fed'n v. Nat'l Marine*

24  *Fisheries Serv.,* 235 F. Supp.2d 1143, 1160 (W.D. Wash. 2002).  In *Nat'l Wildlife Fed'n,* the

25  district court found that plaintiffs were likely to succeed on their claim that an incidental take

26  surrogate that, "in effect, amounts to the project's required work conditions," was invalid.  *Id.* at

27  1160.  There, the court found that allowing take that is entirely coextensive with the project

28

29  PLAINTIFFS' MOTION FOR
    SUMMARY JUDGMENT                    23
    CAUSE NO. 3:19-CV-06071-RJB

*Earthjustice*
810 Third Ave., Suite 610
Seattle, WA  98104
(206) 343-7340

could not provide a meaningful trigger to reinitiate consultation, because it merely insured that the level of permitted take would not be exceeded if the project was completed as planned.

Likewise, in *Oregon Natural Resources Council* the Ninth Circuit held that the Fish and Wildlife Service ("FWS") violated the ESA by setting a take limit for Northern spotted owls that was coextensive with the acreage on which timber sales would be permitted.  476 F.3d at 1037–41.  The court held that this was not the type of numerical take limit that Congress required in the ESA.  While it acknowledged that a surrogate for take is permissible where no numerical limit can be obtained, it held that using the scope of the project itself was not an appropriate numerical limit because it would not trigger reinitiation since there was no clear standard for when the authorized level of take had been exceeded.  *Id.*

The ITS provided by NMFS here presents the same flaw, since it set surrogate incidental take limits equal to the scope of the Project.  For example, for take of listed fish caused by wake stranding, the surrogate was set at 72 vessels per year, the same number of trips estimated by NWIW and the Port for the project.  NMFS 37312–13.  For take of Chinook and steelhead caused by in-water predation from the dock's overwater coverage and elevated sound levels from construction, NMFS set the dock's square footage—10,925 square feet—and the expected number of pile strikes as the take surrogates.  NMFS 37313; NMFS 11–12.[11]

In short, NMFS has not provided meaningful reinitiation triggers to ensure against jeopardy, but rather allowed take of listed species coextensive with the scope of the Kalama Project as planned.  As a result, the ITS does not provide the necessary trigger for reinitiation of consultation, nor can it monitor ESA compliance.  This is a clear violation of the ESA, and constitutes arbitrary and capricious agency action.  *See Nat'l Wildlife Fed'n*, 235 F. Supp.2d at 1160 ("[T]he purpose of establishing a permissible take in an ITS is to ensure that even if the

---

[11] With such overstated measures, there was no measurable way to reinitiate based on the number of pile strikes, pile strikes were clearly not valid surrogates for incidental take, and the ITS failed to set a take limit based on the protection of the species.

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

1   project is implemented in strict accordance with the plan, it will not result in a level of harm to

2   the protected species that would cause the agency to reconsider its jeopardy determination.").[12]

3           B.      NMFS Failed to Provide Valid Surrogates for Take.

4           For purposes of specifying the "amount or extent" of take, Congress indicated that

5   "[w]here possible, the impact should be specified in terms of a numerical limitation."  H.R. Rep.

6   No. 97-567, 97th Cong., 2d Sess. 27 (1982).  Accordingly, courts have recognized that the

7   permissible level of take in an ITS "ideally should be expressed as a specific number."  *Ctr. for*

8   *Biological Diversity v. Salazar*, 695 F.3d 893, 911 (9th Cir. 2012) (citations omitted).

9           However, where a precise numerical limitation is impractical or otherwise cannot be

10   obtained, NMFS may use a surrogate to express the amount or extent of take.  50 C.F.R. §

11   402.14(i)(1)(i); *Or. Natural Res. Council v. Allen*, 476 F.3d 1031, 1038 (9th Cir. 2007).  To be

12   permissible, the surrogate "must be able to perform the functions of a numerical limitation."

13   *Allen*, 476 F.3d at 1038.  At a minimum, the surrogate must "establish a link between the activity

14   and the taking of species," and contain "measurable guidelines" sufficient to allow the applicant

15   to determine when incidental take is exceeded and, accordingly, when to reinitiate consultation.

16   *Ariz. Cattle Growers' Ass'n*, 273 F.3d at 1250; *Allen*, 476 F.3d at 1038.

17           NMFS failed to meet these requirements.  The Biological Opinion acknowledged that

18   wake stranding will have measurable effects on listed fish, but concluded without explanation

19   that the increased number of ship passages from the Kalama Project (72 per year) would not

20   _____

21   [12] After Plaintiffs commenced this case, NMFS issued a "Revised" Incidental Take Statement,
     without reinitiating consultation on the Biological Opinion.  NMFS 8–14.  The Revised ITS
22   deleted a general take exemption for the action agency, added a take exemption for eulachon,
     added a surrogate take limit for leatherback sea turtles, and added terms and conditions for
23   monitoring incidental take, *id.* at 10–14.  The revised ITS is patently invalid; NMFS cannot
     interject new explanations or conditions after the consultation process has finished without
24   reinitiating consultation.  *See Gifford Pinchot Task Force v. U.S. Fish and Wildlife Serv.*, 378
     F.3d 1059, 1077 (9th Cir. 2004) (rejecting attempt to amend biological opinions during
25   litigation).  It is firmly established that agencies cannot use post-hoc rationalizations to remedy
     inadequacies in the agency's decision and record, and a new analysis cannot be used to support a
26   decision already made.  *See also Securities & Exchange Comm'n v. Chenery Corp.*, 332 U.S.
     194, 196 (1947).
27

28

29   PLAINTIFFS' MOTION FOR
     SUMMARY JUDGMENT                          25
     CAUSE NO. 3:19-CV-06071-RJB

1   increase mortality caused by wake stranding enough to have an observable impact on the long-

2   term abundance trends of any of the affected species or their populations.  *Cf.* NMFS 37294 *with*

3   NMFS 37285.  NMFS also failed to analyze or explain its conclusion that bank erosion and

4   shoreline armoring effects were expected to be minor.  NMFS 37268; *cf.* NMFS 37303.

5          The surrogates NMFS used do not provide the required connection to actual take of

6   species.  The Services have explained that take may be expressed by reference to changes in

7   habitat characteristics, such as those NMFS uses here, but only if "data and information exists

8   which links such changes to the take of listed species."  ESA Consultation Handbook, at 4-47 to

9   4-48.  Indeed, the Services' 2015 regulations on Incidental Take Statements discuss how a

10  surrogate may fulfill the intended function as an independent trigger for reinitiation, such as

11  when a species is difficult to survey and relies entirely on a distinct and confined area, such as

12  fairy shrimp that live in vernal pools, where "effects to vernal pool fairy shrimp habitat are

13  casually related to take of the fairy shrimp."  80 Fed. Reg. 26,832, 26,834 (May 11, 2015).  The

14  regulations make clear that a "surrogate that did not fulfill this role would not meet the

15  requirements of this rule."  *Id*. at 26,842.

16         In sum, a surrogate must provide "some detectable measure of effect" on the species,

17  such as "the number of burrows affected or a quantitative loss of cover, food, water quality, or

18  symbionts."  *Id*. at 26,834.  In contrast, where habitat characteristics and take of species are not

19  linked, the ITS is arbitrary and capricious.  For example, in the ITS at issue in *Arizona Cattle*

20  *Growers' Association*, 273 F.3d at 1249, the FWS utilized a surrogate to determine take of loach

21  minnow from the proposed action.  In particular, FWS defined the surrogate by reference to

22  certain ecological conditions (*i.e.*, watershed, soil, rangeland, and stream-channel conditions) and

23  provided that takings would occur if such conditions did not improve.  *Id*. at 1249–50.  The

24  Ninth Circuit held that the ITS was arbitrary and capricious because the Service did not articulate

25  a "rational connection between [the ecological conditions] and the taking of species."  *Id*. at

26  1251.

27

28

29

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

1   Like the use of ecological conditions as surrogate reinitiation triggers at issue in *Arizona*

2  *Cattle Growers' Association*, NMFS' conclusory statements purport to establish causation by

3  reference to various habitat impacts (*e.g.*, in-water predation from the dock's overwater

4  coverage, elevated sound levels from construction, and wake stranding and strikes from vessel

5  traffic) but do not articulate a rational connection between the surrogate and the take of listed

6  species.  NMFS' causation-by-proportionality explanation paints with a broad brush and is not

7  what Congress intended when it authorized the use of surrogate triggers.  *Id.* at 1250.

8   Because NMFS did not provide any analysis of the actual impacts associated with these

9  coextensive triggers or otherwise establish a sufficient causal connection between the triggers

10  and take of species, the surrogates are meaningless and cannot support NMFS' no-jeopardy

11  conclusion.  NMFS simply failed to draw any connection between the measures used as

12  surrogates in the ITS (wake stranding, shoreline armoring, vessel trips) and their necessary

13  function as an independent trigger for reinitiation.  *See id.* at 1250 (quoting Section 7

14  Consultation Handbook examples of surrogate measures).  Accordingly, the ITS is arbitrary and

15  capricious.

16   C.   NMFS Failed To Set a Take Limit for Southern Resident Killer Whales.

17   Southern Resident killer whales are highly endangered, with only 73 wild individuals

18  known to exist in the wild.  Center for Whale Research, *Southern Resident Killer Whale*

19  *Population*, *available at* https://www.whaleresearch.com/orca-population (last accessed Aug. 21,

20  2020).  According to NMFS, the loss of even a single individual, or the decrease in reproductive

21  capacity of a single individual, is likely to appreciably reduce the likelihood of survival and

22  recovery of the Southern Residents.  NMFS, Biological Opinion on Effects of the Pacific Coast

23  Salmon Plan on the Southern Resident Killer Whale (*Orcinus orca*) Distinct Population Segment

24  (2009).  The Southern Resident killer whale population is so fragile that NMFS will "scrutinize

25  even small effects on the fitness of individuals that increase the risk of mortality or decrease the

26  chances of successful reproduction."  NMFS, Effects of the Pacific Coast Salmon Plan on the

27  Southern Resident Killer Whale (*Orcinus orca*) Distinct Population Segment" at 56 (2009).

28

29  PLAINTIFFS' MOTION FOR
   SUMMARY JUDGMENT                    27
   CAUSE NO. 3:19-CV-06071-RJB

*Earthjustice*
810 Third Ave., Suite 610
Seattle, WA  98104
(206) 343-7340

NMFS has further acknowledged that due to overlap of heavy shipping traffic and high whale density, Oregon and Washington waters are a high-risk area for ship strike events.  NMFS 37295.  NMFS assumes that any whales struck by ships from the Proposed Action will likely die as a result of collision.  NMFS 37296.  NMFS provides general conservation measures to avoid collisions.  *Id.*

NMFS must issue an ITS "if the [Biological Opinion] concludes no jeopardy to listed species … but the action is likely to result in incidental takings."  *ONRC v. Allen*, 476 F.3d at 1036.  The plain language of the ESA requires that when NMFS finds that "the taking of an endangered species or a threatened species incidental to the agency action will not" jeopardize the continued existence of a species, but will nevertheless adversely impact a species, it must issue a statement that "specifies the impact of such incidental taking on the species."  16 U.S.C. § 1536(b)(4); *Ctr. for Biological Diversity v. BLM*, 833 F.3d 1136, 1142–43 (9th Cir. 2016).  NMFS acknowledged that individual takings occur, but set no incidental take limits for Southern Resident killer whales.  NMFS 37317–18, 37296.  NMFS' failure to set any incidental take limit for Southern Resident killer whales was arbitrary, capricious, and contrary to law.

IV.     THE CORPS' PUBLIC INTEREST ANALYSIS IGNORED THE PROJECT'S COSTS.

The Corps' public interest analysis applied the economic benefits of the Refinery to approve permits for the Export Terminal, but excluded the Refinery's adverse impacts to aesthetic, recreation, and property values.  These inadequacies in the Corps' review render its analysis arbitrary and capricious in violation of the CWA and the APA.  The Corps issues individual permits under CWA § 404(a) and Section 10 of the Rivers and Harbors Act on a case-by-case basis after analyzing whether a proposal is in the public interest.  33 C.F.R. § 322.3, Parts 323, 325; 33 U.S.C. § 403; 33 C.F.R. § 322.3 (Corps regulations on activities requiring permits).  The Corps' review "involve[s] the consideration of the full public interest by balancing the favorable impacts [of a project] against the detrimental impacts."  33 C.F.R. § 320.1(a).  The Corps must balance "the benefits which reasonably may be expected to accrue from the proposal" against "its reasonably foreseeable detriments."  *See* 33 § C.F.R. 320.4(a)(1).

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

A.   The Corps Considered Economic Activity That is Beyond the Proper Scope of the Public Interest Analysis.

The economic factors the Corps considered in its public interest analysis for the Export Facility are unrelated to changes in the physical environment at the Project site and outside the proper scope of a public interest review.  The Corps ultimately concluded that potential employment opportunities created by the Project outweigh all of the Projects' negative impacts on the environment.  *See* COE 13292 ("the proposed project would have some temporary and long-term adverse effects on the environment and public safety, but would have a greater beneficial long-term effect on economics ....").  Even if this were true—and there is good reason to believe it is not—the Corps may not rely on economic benefits unrelated to physical development of the dock.

In *Buttrey v. United States*, a plaintiff who had been denied a CWA Section 404 permit argued "that the Corps should have considered the public benefits of the $3 million or so in public jobs that the construction of his proposed housing addition would create."  690 F.2d. 1170, 1180 (5th Cir. 1982).  The Court quickly dismissed these considerations as "not the kind of 'economic' benefit the Corps' public interest review is supposed to consider."  *Id.* (*citing* Regulatory Programs of the Corps of Engineers, 42 Fed. Reg. 37,122, 37,125–26 (1977)).  Similarly, *Mall Properties, Inc. v. Marsh* held that the Corps exceeded its authority "by basing its denial of the permit on socio-economic harms that are not proximately related to changes in the physical environment."  672 F. Supp. 561, 563 (D. Mass. 1987).  In that case, the Corps had declined to issue a developer a fill permit for the construction of a shopping mall because of the socio-economic effect the mall would have on the economy of the town.  *Id.* at 565.  After conducting a lengthy analysis of the underlying policies of the CWA and the Corps' regulations at 33 C.F.R. 320.4(a), the court concluded that "the Corps may not rely upon economic factors which are not proximately related to changes in the physical environment ...."  *Id.* at 567, 571.  The court found that the proper scope of the Corps' public interest inquiry would include

PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT                    29
CAUSE NO. 3:19-CV-06071-RJB

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

1  economic impacts on such things "as the commercial or recreational value of areas directly

2  affected by a change in the environment." *Id.* at 567–68.

3       With respect to the Kalama Project, the Corps' economic analysis focused on an

4  unsupported discussion of the employment rate in Cowlitz County and the Project's potential to

5  generate both temporary and permanent employment opportunities. *See* COE 13256. As the

6  Fifth Circuit held in *Buttrey*, an analysis of potential employment opportunities is "not the kind

7  of 'economic' benefit the Corps' public interest review is supposed to consider." *Buttrey*, 690

8  F.2d at 1180. Since the Corps' economic analysis was not related to the changes in the physical

9  environment at the site, it is arbitrary, capricious, and contrary to law.

10       **B.**    <u>The Corps' Public Interest Review of the Export Terminal Arbitrarily Counted the</u>

11  <u>Benefits—but not the Significant Costs—of the Refinery.</u>

12       When conducting its public interest review of the Kalama Project, the Corps relied on the

13  alleged benefits of the Refinery, but ignored the Refinery's costs. Even if the Corps could

14  legally consider the economic activity generated by the Refinery (which, as explained above, it

15  cannot), relying on the benefits but ignoring Refinery's costs was arbitrary. A district court in

16  Montana found that a federal agency failed to take the requisite hard look at greenhouse gas

17  emissions when, like here, it adopted a quantitative analysis of the <u>benefits</u> of a proposed mine

18  expansion, but did not quantify the associated <u>costs</u>. *MEIC v. U.S. Office of Surface Mining*, 274

19  F. Supp.3d 1074, 1098 (D. Mont. 2017). The court rejected the analysis, stating it "is illogical,

20  and places the Enforcement Office's thumb on the scale by inflating the benefits of the action

21  while minimizing its impacts." *Id.*

22       The Corps' public interest determination for the Export Terminal depends entirely on the

23  purported benefits of the Refinery. *See* Section 7 of the EA, COE 13251–95. The Corps'

24  analysis of the Export Terminal included no discussion of the benefits, economic or otherwise,

25  separate from the Refinery. *Id.* Nor could it; the Export Terminal is useless without the

26  Refinery. And the Corps admits that—for purposes of NEPA—the three pieces of the Kalama

27

28

29  PLAINTIFFS' MOTION FOR
   SUMMARY JUDGMENT            30
   CAUSE NO. 3:19-CV-06071-RJB

*Earthjustice*
810 Third Ave., Suite 610
Seattle, WA  98104
(206) 343-7340

Project were so connected they "d[id] not have independent utility." COE 13150. The Corps' ultimate conclusion with respect to the Export Terminal was that:

> [t]he beneficial effects associated with the utilization of the property would be permanent. Detrimental effects would result due to the development of the Marine Export Facility, construction of the Lateral Project, and construction of the Kalama Methanol Facility. The beneficial effects associated with the utilization of the property would be permanent and would contribute to the local economy and would provide a new methanol export facility to serve the export market.

COE 13294. Yet the Corps declined to complete a public interest determination for the Refinery, claiming that "given the Kalama Methanol Facility is located outside of Corps jurisdiction (*i.e.*, no Corps permit required), a public interest determination is not warranted for the Kalama Methanol Facility," and excluded from consideration in balancing the public interest factors the impacts of the Refinery on greenhouse gas emissions (under the "general environmental concerns" and "air quality" factors), aesthetics, property values, and recreation. COE 13295; 33 C.F.R. § 320.4.

The manufacturing process alone is estimated to produce between 976,000 and 1.4 million tons of GHGs annually—approximately 1% of Washington State's total greenhouse gas emissions, even without including significant upstream and downstream greenhouse gas emissions from fracked gas extraction, transportation, conversion of methanol to olefins, or combustion as fuel. COE 3735, 13261. This will lead to declining snowpack, increased disease outbreak, wildfires, impacts to species, sea level rise, and higher temperatures in the Northwest. COE 9721–22. Yet the Corps downplays the industrial character, sheer size, and amount of pollution created by the Refinery in a stretch of the Columbia River that is home to endangered species, local residents, and recreation.

With respect to aesthetics, the Corps concluded that because the Project will be located in an industrial area, the construction and operation of the facility would have a negligible effect on aesthetics. COE 13257. For example, the Corps concluded that the "[n]ighttime lighting and the flare system . . . would blend in with the other industrial activities on the Columbia River." *Id.* The most prominent part of the "flare system" is a 245-foot tall natural gas flare that will

PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT                    31
CAUSE NO. 3:19-CV-06071-RJB

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

1    intermittently include a visible flame.  COE 8079–80.  The flare will be the tallest structure at the

2    facility—and likely the Port—and emit a visible flame for up to 109 hours per year.  *Id.*  And the

3    steam plumes from its cooling systems will extend up to three miles high.  NMFS 37698.

4    Additionally, the Corps failed to address the significant change in aesthetics both the Export

5    Terminal and the Refinery will create for on-water users and those individuals recreating directly

6    across the river at Prescott Beach Park.  Flynn Declaration, ¶ 3.  The view from that vantage

7    point is expected to change considerably "by replacing a cleared site with a new industrial use."

8    COE 8101, COE 8107–9, *see* Johnson Declaration, ¶ 6.  The Corps' conclusion that the

9    "[c]onstruction and operation of the Kalama Methanol Facility would have a negligible effect to

10   aesthetics"—despite these glaring omissions in its analysis—render the Corps' decision arbitrary

11   and capricious.

12           With respect to property values, the only mention of nearby private properties appeared

13   in the Corps analysis of the aesthetic impacts of the Project.  COE 13257.  Even there, the Corps

14   failed to conduct any meaningful analysis aside from noting that the Project would "contrast with

15   the naturalistic character of the residential properties directly across the Columbia River."  *Id.*

16   The Corps failed to address the potential drop in property values for those residential properties

17   whose views will now be dominated by a 90-acre refinery with multiple emissions stacks and a

18   245-foot tall flare.  COE 13172; Flynn Declaration ¶ 3.

19           Additionally, the Corps minimized the significant impact the construction and operation

20   of what has been touted as the largest fracked gas-to-methanol facility in the world will have on

21   nearby recreation.  In its analysis of recreation impacts, the Corps concluded that the Kalama

22   Project "would have a temporary short term adverse effect and a long term beneficial effect on

23   recreation."  COE 13280.  The basis for this conclusion was that the construction of a new access

24   road and parking lot—where there is currently an informal recreation area—along with long-

25   term beach replenishment that would occur from the natural movement of the discharged

26   dredged material would outweigh any negative impact from increased activity at the site.  *Id.*

27   The Corps' review, however, lacked any analysis of the potential drop in recreation use that will

28

29   PLAINTIFFS' MOTION FOR
     SUMMARY JUDGMENT                              32
     CAUSE NO. 3:19-CV-06071-RJB

almost certainly occur once the massive facility is built.  The Project will "result in a substantial change in the character of views to the south from the recreation area"—the parking area for the recreation area will be just 100 feet from the refinery's infiltration pond and 250 feet from the flare.  COE 8111.  Even if the facility operates in compliance with its air permit, there will almost certainly be significant, noticeable air quality impacts associated with operation of the refinery.  NWIW's proposed mitigation offsets or other offsite measures do not cure emissions pollution at the facility itself, which will be quite significant.  The Corps' decision to focus its analysis on the attenuated recreational benefits and its failure to consider the significant potential impact of air emissions on recreational use of the Project site is arbitrary and capricious.

The Corps claims to have evaluated the CWA public interest factors only for the Export Terminal, but if the Corps may impute the benefits from the Refinery to the Export Terminal, it must also honestly consider the negative impacts.  The Corps cannot cherry-pick at its convenience.  The Corps' evaluation of this public interest factor was arbitrary and capricious and should be remanded back to the Corps for further analysis.

## CONCLUSION

For the foregoing reasons, Plaintiffs Columbia Riverkeeper et al. respectfully ask this Court to vacate the Corps' EA and CWA § 404 and River and Harbors Act permit, remand to the Corps to prepare a full EIS on the Kalama Project before reconsidering new permits, vacate the NMFS Biological Opinion and its accompanying ITS (both original and revised), and remand to NMFS to re-engage and complete ESA § 7 consultation on the Kalama Project, including a valid ITS.

///

///

///

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7400*

1   Respectfully submitted this 21st day of August, 2020.

2

3                                    */s/ Paulo Palugod*
                                    PAULO PALUGOD, WSBA #55822
4                                   KRISTEN L. BOYLES, WSBA #23806
                                    Earthjustice
5                                   810 Third Avenue, Suite 610
                                    Seattle, WA  98104-1711
6                                   Ph.:  (206) 343-7340
                                    ppalugod@earthjustice.org
7                                   kboyles@earthjustice.org

8
                                    *Attorneys for Plaintiffs*
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29   PLAINTIFFS' MOTION FOR
     SUMMARY JUDGMENT                          34
     CAUSE NO. 3:19-CV-06071-RJB

CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to the attorneys of record and all registered participants.

DATED this 21st day of August, 2020.

*/s/ Paulo Palugod*
PAULO PALUGOD, WSBA #55822

PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT
CAUSE NO. 3:19-CV-06071-RJB

35

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*