1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9
10

| | |
|---|---|
| COLUMBIA RIVERKEEPER, SIERRA CLUB, CENTER FOR BIOLOGICAL DIVERSITY, WASHINGTON ENVIRONMENTAL COUNCIL, and WASHINGTON PHYSICIANS FOR SOCIAL RESPONSIBILITY, | CASE NO. 19-6071 RJB<br><br>ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT |
| Plaintiffs, | |
| v. | |
| UNITED STATES ARMY CORP OF ENGINEERS, and NATIONAL MARINE FISHERIES SERVICE, | |
| Defendants. | |
| and | |
| PORT OF KALAMA, | |
| Intervenor-Defendant. | |

This matter comes before the Court on the Plaintiffs' Motion for Summary Judgment (Dkt. 63), the Federal Defendants' Cross Motion for Summary Judgment (Dkt. 74), and the

1   Intervenor Defendant Port of Kalama's ("Port") Cross Motion for Summary Judgment (Dkt. 73).

2   The Court has considered the pleadings filed regarding the motions and the file herein.

3          In this case, the Plaintiffs challenge the Defendant United States Army Corps of

4   Engineers' ("Corps") findings in its Environmental Assessment ("EA") and the Corps failure to

5   conduct an Environmental Impact Statement ("EIS") before issuing permits under the Clean

6   Water Act ("CWA") and Rivers and Harbors Act ("RHA").  Dkt. 1.  Those permits authorized

7   the discharge of dredge or fill materials into the Columbia River for construction of a portion of

8   the Kalama Manufacturing and Marine Export Facility ("Kalama Project" or "Project").  *Id*.  The

9   Plaintiffs also contend that the Incidental Take Statement ("ITS") from Defendant National

10  Marine Fisheries Service ("NMFS"), which was completed as part of Marine Fisheries'

11  Endangered Species Act ("ESA") § 7 consultation with the Corps on the Project, was invalid.  *Id*.

12         The Plaintiffs now move the Court for an order vacating the permits and remanding the

13  matter to the Corps to prepare an EIS and to re-engage with NMFS in an ESA § 7 consultation

14  regarding the Kalama Project, to produce a valid ITS.  The Corps and the Port both move for

15  summary judgment dismissal of the Plaintiffs' case.

16         For the reasons provided below, the parties' motions for summary judgment should

17  denied, in part, and granted, in part.  The permits should be vacated and the case remanded to the

18  Corps to prepare an EIS.

19                    I.      **RELEVANT FACTS AND PROCEDURAL HISTORY**

20     **A.  THE KALAMA PROJECT**

21         The Kalama Project is a proposed methanol refinery ("Methanol Refinery"), and export

22  facility ("Export Terminal"), and a pipeline, which will supply the Methanol Refinery with

23  natural gas, ("Lateral Project").  Dkt. 49-3.  The permits that are the subject of this lawsuit were

24

1  for construction of the Export Terminal, which consists of a dock, berth, methanol pipelines,

2  inert gas lines, vapor return lines, support structures, loading equipment, utilities, and stormwater

3  system.  Dkt. 49-3, at 6-7.

4  Proposed by Northwest Innovation Works ("NWIW"), the Kalama Project would be on

5  approximately 90 acres of land leased from the Port and financed, in part, by a $2 billion dollar

6  loan from U.S. Department of Energy.  Dkt. 49-3, at 4-5.  If completed, the Kalama Project

7  would be one of the largest fracked gas-to-methanol refineries in the world.  The Export

8  Terminal would be used to load approximately 72 ocean going vessels a year with manufactured

9  methanol for export to Asia.  Dkt. 49-3, at 7 and 36.  The methanol will be used to make plastics.

10  Dkt. 49-3, at 36.

11  Emissions associated with the manufacturing process are estimated to exceed 1,000,000

12  tons of carbon dioxide equivalent a year.  Dkt. 49-3.  According to NWIW and the Port, the

13  Kalama Project will generate millions of additional tons of carbon dioxide equivalent per year in

14  upstream natural gas consumption and downstream shipping and product production. Dkt. 48-14.

15  **B. LEGISLATIVE BACKGROUND AND ACTIONS OF THE CORPS AND NMFS**

16  In making the permitting decision, the Corp performed an EA pursuant to the National

17  Environmental Policy Act ("NEPA").  Dkt. 49-3.  NEPA "'imposes procedural requirements

18  designed to force agencies to take a 'hard look' at environmental consequences' of their

19  proposed actions," like the permitting decisions here.  *Bark v. United States Forest Serv*., 958

20  F.3d 865, 868 (9th Cir. 2020)(*quoting League of Wilderness Defs./Blue Mountains Biodiversity*

21  *Project v. Connaughton*, 752 F.3d 755, 763 (9th Cir. 2014).  NEPA requires that agencies

22  "prepare an EIS for federal actions that will 'significantly affect[] the quality of the human

23  environment.'" *Id*. (*quoting* 42 U.S.C. § 4332(2)(C)).  "[A]gencies must prepare an [EA] that

24

1    'briefly provides sufficient evidence and analysis for determining whether to prepare an [EIS] or

2    a finding of no significant impact.'" *Bark*, at 868 (*quoting* 40 C.F.R. § 1508.9(a)(1)). "An EIS is

3    required when this process raises substantial questions about whether an agency action will have

4    a significant effect." *Id.* On the other hand, "[i]f the agency concludes in the EA that there is no

5    significant effect from the proposed project, the federal agency may issue a finding of no

6    significant impact in lieu of preparing an EIS." *Id.* In this case, the Corps performed an EA and

7    issued a "finding of no significant impact." Dkt. 49-3. It did not prepare an EIS.

8          In making the permitting decisions, the Corps was also required to do a "public interest"

9    assessment, which is required under both the CWA and the RHA, 33 U.S.C. § 1344; 33 U.S.C. §

10    403; 33 C.F.R. § 302.4. It did the "public interest" assessment in the EA. Dkt. 49-3.

11          Further, the Corps engaged in a consultation, pursuant to § 7 of the ESA, with NMFS in

12    order to determine whether the permitting decisions here would affect a listed species or critical

13    habitat. Dkt. 49-3. Section 7(a)(2) of the ESA provides,

14        [E]ach Federal agency shall, in consultation with and with the assistance of the
15        Secretary [of Commerce or the Interior] insure that any action authorized, funded,
          or carried out by such agency ... is not likely to jeopardize the continued existence
16        of any endangered species or threatened species or result in the destruction or
          adverse modification of [the critical] habitat of such species....

17    16 U.S.C. § 1536(a)(2). During this type of consultation, the NMFS issues a biological opinion,

18    detailing how the proposed action will affect the listed species or habitat. 50 C.F.R. § 402.14. If

19    the NMFS concludes in the biological opinion that the proposed action will not likely jeopardize

20    the continued existence of a listed species but is reasonably certain to result in an incidental take,

21    it issues an ITS. 50 C.F.R. § 402.14(g)(7). The NMFS here issued a biological opinion and ITS

22    (Dkt. 28-4, at 424-595), and after this case was filed, a Revised ITS (Dkt. 28-4, at 607-615). In

23    the biological opinion, the NMFS found that the Project would adversely affect certain species of

24

1   salmon (for example, "Lower Columbia River Chinook," "Columbia River chum," "Snake River

2   sockeye"), certain species of steelhead (like "Upper Willamette River steelhead") eulachon, and

3   leatherback turtles (collectively "relevant species"). Dkt. 28-4, at 424-425.

4   **C.  PENDING MOTIONS**

5        The Plaintiffs argue that Corps' decision to issue the permits violated NEPA because the

6   Corps failed to consider the indirect and cumulative impacts caused by the Kalama Project and

7   failed to properly assess the need to prepare an EIS.  Dkt. 63.  The Plaintiffs' also contend that

8   the Corps failed to properly conduct the "public interest" review required under both the CWA

9   and RHA.  *Id.*  The Plaintiffs maintain that NMFS failed to properly set take limits for

10  endangered and threatened species.  *Id.*

11       The Federal Defendants oppose the Plaintiffs' motion and move the Court for summary

12  judgment finding that they met their statutory obligations.  Dkt. 74.  The Intervenor-Defendant

13  Port also opposes the Plaintiffs' motion and moves for summary judgment.  Dkt. 73.

14                                **II.        DISCUSSION**

15  **A.  SUMMARY JUDGMENT STANDARD**

16       Summary judgment is proper only if the pleadings, the discovery and disclosure materials

17  on file, and any affidavits show that there is no genuine issue as to any material fact and that the

18  movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a). The moving party is

19  entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

20  showing on an essential element of a claim in the case on which the nonmoving party has the

21  burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue

22  of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find

23  for the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

24

(1986)(nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt").  Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

**B.  STANDARD OF REVIEW FOR NEPA, ESA, CWA and RHA BASED CLAIMS**

Compliance with NEPA and the ESA for governmental agencies is reviewed under the Administrative Procedures Act ("APA").  *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014); *Ctr. for Biological Diversity v. Ilano*, 928 F.3d 774, 779–80 (9th Cir. 2019)(*internal quotation marks and citations omitted)*.

"Under the APA, a court may set aside an agency action if the court determines that the action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Ctr. for Biological Diversity,* at 780.

> [The courts] will reverse a decision as arbitrary and capricious only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1074–75 (9th Cir. 2011). The Corps decisions under the CWA and RHA are also reviewed under the arbitrary and capricious standard. *See Bering Strait Citizens for Resource Development v. Army Corps of Engineers*, 524 F.3d 938 (9th Cir. 2008).

**C.  NEPA**

1.  Corps' Scope of NEPA Review

The Corps included, in its EA review, all three proposed parts of the Kalama Project (Methanol Refinery, Export Terminal, and the Lateral Project) "including portions outside waters of the United States only if sufficient Federal control and responsibility over the entire project is determined to exist; that is, if the regulated activities and those activities involving regulation, funding, etc. by other federal agencies comprise a substantial portion of the overall project." Dkt. 49-3, at 31. In making that decision, the Corps explained that the three proposed projects are not "merely a link" with one another and that aspects of the three projects "affect the location and configuration" of the others. Dkt. 49-3, at 30. Further, the Corps determined that the Export Facility and Lateral Project are within its' jurisdiction, and that through the loan guarantee program, the Methanol Refinery was within the jurisdiction of the Department of Energy. Dkt. 49-3, at 31 (*citing* 33 C.F.R. § 325 App. B, which provides, in part, that the scope of the NEPA document should be established to "address the impacts of the specific activity requiring a [Corps] permit and those portions of the entire project over which the district engineer has sufficient control and responsibility to warrant Federal review"). The Corps restricted its NEPA review to geographic area of Washington and parts of Oregon. Dkt. 49-3, at 161.

The Plaintiffs argue that the Corps' decision to issue the permits was arbitrary and capricious because it did not consider all "reasonably foreseeable" effects of the proposed action when it limited the scope of its review in the EA analysis. Dkt. 63. The Plaintiffs assert that the Corps should have considered the "reasonably foreseeable" indirect and cumulative impacts of downstream and upstream greenhouse gas emissions from the Project and a related action – the need to expand the regional gas pipeline system to accommodate the Project.

In determining the scope of analysis for either an EIS or an EA, "NEPA requires an agency to consider the cumulative impacts of a project." *Jones v. Nat'l Marine Fisheries Serv.*,

1    741 F.3d 989, 1000 (9th Cir. 2013).  "NEPA's implementing regulations define 'cumulative

2    impacts' as 'the impact on the environment which results from the incremental impact of the

3    action when added to other past, present, and reasonably foreseeable future actions.'"  *Id.*

4    "Reasonably foreseeable means sufficiently likely to occur such that a person of ordinary

5    prudence would take it into account in reaching a decision."  40 C.F.R. § 1508.1(aa).

6              a.  *Failure to Consider Cumulative Impact of Greenhouse Gas Emissions*

7              The Corps' failure to consider "reasonably foreseeable" greenhouse gas emissions

8    outside Washington and part of Oregon was arbitrary and capricious.  The Corps found that the

9    three segments of the Project should be considered together.  It noted that the purpose of the

10   Methanol Refinery is to "construct and operate a natural gas to methanol facility to ship the

11   methanol primarily to Asia for the production of olefins."  Dkt. 49-3, at 36.  The Corps noted that

12   the Methanol Refinery will account for 1% of the State of Washington's annual greenhouse gas

13   emissions and noted that NWIW planned to "voluntarily mitigate 100 percent of all project

14   generated greenhouse gas emissions in the State of Washington."  Dkt. 49-3, at 114-115.  It

15   pointed to benefits of the Project as reducing greenhouses gases outside the geographical area it

16   set; the EA stated that the Kalama Project "produces methanol using a technology that will

17   produce less air pollution and greenhouse gas emissions than methanol production using coal,"

18   which is "widely used." Dkt. 49-3.  It further provided that:

19              Most of the methanol generated in China is produced from coal based methanol
             facilities that generate approximately 5.5 to 6.2 times higher [greenhouse gas]
20           emissions than the anticipated [greenhouse gas] emissions generated at the natural
             gas-based Kalama Methanol Facility. NWIW anticipates that producing methanol
21           in Kalama from natural gas would displace methanol production from existing
             coal-based plants in Asia (due to cost advantages).
22
23   Dkt. 49-3, at 165.  The Corps then arbitrarily declined to consider reasonably foreseeable indirect

24   cumulative effects of the Project's greenhouse gas emissions, like, but not limited to, increased

fracking (and attendant emissions), and emissions from shipping methanol and producing olefins in Asia and elsewhere.  "[C]umulative impact analyses [are] insufficient when they discuss[] only the direct effects of the project at issue on a small area and merely contemplate[] other projects but [have] no quantified assessment of their combined impacts."  *Bark v. United States Forest Serv*., 958 F.3d 865, 872 (9th Cir. 2020).  While the Corps found that the "end use of methanol is too attenuated and far removed from the permitting applications," the Corps received information through public comments and in an EIS done in 2016 by the State of Washington (during state permitting processes) and a supplemental EIS done by the State in 2018 about those activities' greenhouse gas emissions, but failed to consider them.  (The parties indicate that yet another supplemental EIS has been done by the state, due to challenges to the other two, but this was not considered because it was not in the record before the Corps).  The Corps assertion that these greenhouse gas emissions are outside their jurisdiction does not relieve it of its duty to take a "hard look."  "The fact that climate change is largely a global phenomenon that includes actions that are outside of the agency's control does not release the agency from the duty of assessing the effects of its actions on global warming within the context of other actions that also affect global warming."  *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1217 (9th Cir. 2008)(*internal quotation marks and citations omitted*).  The Plaintiffs have shown that there are no issues of fact and they are entitled to a judgment as a matter of law that the Corps violated NEPA when it failed to consider indirect cumulative greenhouse gas emissions from the Project.  The Plaintiffs' motion for summary judgment should be granted and the Defendants' and Intervenor Defendant's motions for summary judgment should be denied on this issue.

> b.  *Failure to Consider Cumulative Action - Need for New Regional Pipeline*

The Plaintiffs assert that the Corps violated NEPA when it failed to consider the need for a new regional gas pipeline if the Project is approved.  Under the section "Cumulative Impacts" the EA found that "[b]ased on the information available, including consideration of Northwest Pipeline's response, there is not sufficient evidence to consider expansion of the larger Northwest [gas pipeline] system a 'reasonably foreseeable action.'"  Dkt. 49-3, at 53.  The EA states that Northwest Pipeline's response was that the Lateral Project can provide natural gas to the Project "for the long-term without the need to expand the Northwest system to accommodate the volume needed."  *Id.*

The Corps violated NEPA when it failed to consider expansion of the existing regional gas pipeline system in its EA as a cumulative indirect effect of the Project.  It failed to reconcile conflicting evidence in the record.  For example, the Plaintiffs point to a portion of the record containing a gas industry study, dated after the evidence relied upon by the Corps, that "a large enough project (roughly over 150,000 [Dekatherms per day ("Dth/day")] of demand) would likely need new infrastructure regardless of their preferred gas transportation type simply due to high utilization of the existing pipeline systems."  Dkt. 54-1, at 232.  (Dekatherms are units used to measure natural gas. *Id.*)  The record indicates that the Project would need about 290,000 Dth/day.  Dkt. 54-1, at 248.  Further, the Plaintiffs point out that the evidence relied on by the Corps, the letter from Williams indicated that the Project would get "first priority" and a FERC determination (dated before the industry study) that at peak times some customers might be displaced, supports the idea that a new gas line will be needed.  They point out that "first priority" does not mean that there is sufficient capacity.  Although "reasonably foreseeable future action" does not include a project that is "merely contemplated," *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton,* 752 F.3d 755, 762 (9th Cir.

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT - 10

1   2014)(*internal quotation marks and citations omitted*), the Plaintiffs point to evidence in the

2   record that expansion of the regional gas lines is more than "merely contemplated."  Further,

3   while the Corps found that "[t]here is no current proposal or other information for the Corps to

4   consider the scope, magnitude, or timeframe of such future activity" (Dkt. 49-3, at 53),

5   "reasonably foreseeable future actions need to be considered even if they are not specific

6   proposals."  *N. Plains Res. Council,*  at 1079.  The Plaintiffs have shown that there are no issues

7   of fact and they are entitled to a judgment as a matter of law that the Corps' failure to consider

8   the need for expansion of a regional gas pipeline was arbitrary and capricious; it violated NEPA.

9   The Plaintiffs' motion for summary judgment should be granted and the Defendants' and

10  Intervenor Defendant's motions for summary judgment should be denied on this issue.

11         2.  <u>Corps' Decision not to Conduct EIS</u>

12         In addition to arguing that the Corps' EA was not adequate, the Plaintiffs argue that the

13  Corps was obligated to prepare an EIS.  NEPA requires that agencies "prepare an EIS for federal

14  actions that will 'significantly affect[] the quality of the human environment.'"  *Bark*, at 868

15  (quoting 42 U.S.C. § 4332(2)(C)).  "Whether an action may 'significantly affect' the

16  environment requires consideration of "context" and "intensity."  *Ctr. for Biological Diversity v.*

17  *Nat'l Highway Traffic Safety Admin*., 538 F.3d 1172, 1185 (9th Cir. 2008).  "Context simply

18  delimits the scope of the agency's action, including the interests affected."  *Id.* (*internal*

19  *quotations and citations omitted*).  "Intensity means 'the severity of the impact.'"  *Ocean*

20  *Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 865 (9th Cir. 2005)(*internal citations*

21  *omitted*). "In considering the severity of the potential environmental impact, a reviewing agency

22  may consider up to ten factors that help inform the 'significance' of a project."  *Id.* (*citing* 40

23  C.F.R. § 1508.27).  "[O]ne of these factors may be sufficient to require preparation of an EIS in

24

1    appropriate circumstances." *Id.*  The Plaintiffs argue that the Corps should have considered three

2    of those factors here:  (a) the degree to which the environmental effects are highly controversial,

3    (b) the unique characteristics of the geographic area, and (c) the impacts to endangered species.

4    Dkt. 63.  Because the Corps should have prepared an EIS based on the first factor raised, the

5    remaining factors will not be addressed here.

6         The Corps erred in assessing the severity of the impact of the Kalama Project, in

7    particular "the degree to which the environmental effects are 'highly controversial.'"  "A project

8    is highly controversial if there is a substantial dispute about the size, nature, or effect of the

9    major Federal action rather than the existence of opposition to a use.  A substantial dispute exists

10   when evidence casts serious doubt upon the reasonableness of an agency's conclusions." *Bark,*

11   at 870.  Although, "[m]ere opposition alone is insufficient to support a finding of controversy."

12   *Id.*

13        The Corps' EA analysis relied on a 2016 EIS done by the Port and Cowlitz County,

14   Washington (the county where the Project would be located) pursuant to state law and a draft

15   supplemental EIS, dated November 13, 2019, done pursuant to state law.  Dkt. 49-3.  The Corps

16   was notified through public comment that the 2016 EIS and 2019 draft supplemental EIS were

17   subject to dispute and that the State Department of Ecology had committed to preparing its own

18   EIS as a result.  The Corps was aware that the challenges raised against the 2016 state EIS and

19   the 2019 draft supplemental EIS related to the greenhouse gas emissions analysis.  The Corps did

20   not wait for completion of the state's process.  The Corps failure to conduct its own EIS, or wait

21   until the state EIS process was finalized if it was going to rely on the state EIS and supplements,

22   was arbitrary and capricious.  The complex and ongoing state proceedings demonstrate that there

23   is considerable controversy about the Project's "size, nature or effect."  While the Defendants

24

1   point to the State Department of Ecology's draft second EIS, dated September 2, 2020, as

2   evidence that they made the correct determination regarding greenhouse gas emissions, this

3   September 2020 EIS should not be considered here because it was not part of the record. *San*

4   *Luis*, at 602 (NEPA review is generally limited to "the administrative record already in

5   existence").  The Corps did not rely on the draft second EIS in coming to its conclusions. The

6   Plaintiffs have raised a "substantial question" as to the Project's potential significant impact on

7   the environment. *Ocean Advocates,* at 867.

8          The Plaintiffs have shown that there are no issues of fact and that they are entitled to a

9   judgment as a matter of law that the Corps' failure to conduct an EIS violated NEPA.  Their

10  motion for summary judgment on that issue should be granted and the Defendants' and

11  Intervenor Defendants' motions on that issue should be denied.

12      **D.  CWA AND RHA – DEFENDANT CORPS – PUBLIC INTEREST ASSESSMENT**

13         The Plaintiffs next argue that the Corps violated the CWA and RHA when it did not

14  properly weigh the public interest in issuance of the permits as required by the CWA, RHA, and

15  33 C.F.R. § 320.4.  Dkt. 63.

16         One of the CWA and RHA's implementing regulations, 33 C.F.R. § 320.4, directs that

17  "[t]he decision whether to issue a permit will be based on an evaluation of the probable impacts,

18  including cumulative impacts, of the proposed activity and its intended use on the public

19  interest." 33 C.F.R. § 320.4(a)(1).  "Evaluation of the probable impact which the proposed

20  activity may have on the public interest requires a careful weighing" of all relevant factors. *Id.*

21  All relevant factors must be considered: "among those are conservation, economics, aesthetics,

22  general environmental concerns, wetlands, historic properties, fish and wildlife values, . . . land

23

24

1    use, . . . shore erosion and accretion, recreation, . . . and, in general, the needs and welfare of the

2    people." *Id.*

3        The Plaintiffs argue that the Corps improperly considered economic activity that is

4    beyond the proper scope of the public interest analysis.  Dkt. 63.  They also maintain that the

5    Corps' public interest review of the Export Terminal arbitrarily counted the benefits, but not the

6    detrimental costs of the Methanol Refinery.  *Id.*

7                    1.   Economic Activity Assessment

8        In its public interest assessment, the Corps concluded that the economic benefit of each

9    of the three components of the Project would be beneficial.  Dkt. 49-3, at 110-111.  It considered

10   that:  "the unemployment rate in Cowlitz County is 8.4% compared to 6.6% in the local metro

11   region (seven Washington counties (Cowlitz, Clark, Lewis, Pacific, Skamania, Thurston, and

12   Wahkiakum) and five Oregon counties (Clackamas, Columbia, Multnomah, Washington, and

13   Yamhill))."  Dkt. 49-3, at 110.  It found that during construction, all three components of the

14   Project "would temporarily generate construction jobs and revenue for contractors as well as

15   revenue for building supply companies that sell construction materials."  *Id.*  Once construction is

16   complete, the Corps noted that the Lateral Project would not provide any permanent jobs, but

17   that operation of the Export Terminal and Methanol Refinery "would permanently generate

18   local jobs."  *Id.*, at 110-111.

19       The Corps did not act arbitrarily or capriciously in considering the benefits of job

20   creation in its public interest analysis of the Project.  Such consideration is expressly

21   contemplated by 33 C.F.R. § 320.4 (q), which note that "economic benefits of many projects are

22   important to the local community and contribute to needed improvements . . . affecting such

23   factors as employment."  Further, the Ninth Circuit Court of Appeals, in *Bering Strait Citizens*

24

1    *for Resource Development v. Army Corps of Engineers*, 524 F.3d 938 (9th Cir. 2008), found that

2    the Corps did not err in considering the benefits of job creation in it public interest assessment

3    under 33 C.F.R. § 320.4, particularly where the Corps noted that the unemployment rate near the

4    proposed project was higher than surrounding areas.  Like the Corps decision in *Bering Strait,* its

5    decision to consider job creation here was not improper.  The Plaintiffs citations to out of circuit

6    cases is unavailing.

7                2.    Consideration of the Benefits, but not the Costs, of the Methanol Refinery

8                In its' public interest assessment, the EA provides that "a public interest determination is

9    not required" for the Methanol Refinery because no permit from the Corps is required for that

10   portion of the project.  Dkt. 49-3, at 149.  Under 33 C.F.R. §320.4(a)(1), the Corps is directed to

11   consider evaluation of "cumulative impacts," and so consideration of the impacts of the

12   Methanol Refinery was required.  While the Corps did consider some of the impacts of the

13   Methanol Refinery, it failed to properly consider the full "cumulative impacts" and relied on the

14   information from the initial 2016 EIS and 2019 draft supplemental EIS to support its' decisions,

15   which was in error as explained above.  It arbitrarily and capriciously relied on benefits of the

16   Project in worldwide reduction of greenhouse gases without conducting an assessment of the

17   detriments worldwide.  Further, the Corps' findings regarding recreation arbitrarily fail to

18   consider whether operation of the Methanol Facility will have noticeable impacts on air quality

19   near the site.

20                3.    Conclusion on CWA and RHA

21                The Plaintiffs have shown that there are no issues of fact and that they are entitled to a

22   judgment as a matter of law that the Corps did not correctly assess the public's interest in the

23   project.  Their motion for summary judgment on this claim should be granted and the case

24

1   should be remanded for public interest assessment.  The Defendants' and Intervenor Defendant's

2   motions should be denied.

3   **E.  ESA – DEFENDANT NMFS' ITS – TAKE LIMITS**

4        In addition to arguing that the Corps' EA was insufficient, that it was obligated to

5   conduct an EIS, and that the Corps failed to properly assess the public's interest in the Project,

6   the Plaintiffs assert that the Corps ESA § 7 consultation with the NMFS resulted in a flawed ITS

7   from the NMFS.  Dkt. 63.

8        Pursuant to the ESA, the "taking" or "take" of listed species is generally prohibited.  16

9   U.S.C. §1538(a)(1).  A "taking" or "take" is defined as: "to harass, harm, pursue, hunt, shoot,

10  wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. §

11  1532(19).  Under § 7 of the ESA, "federal agencies wishing to engage in action that may

12  adversely affect an endangered or threatened species to consult" first with the either the

13  Secretary of Commerce or Interior.  *Ctr. for Biological Diversity v. Bureau of Land Mgmt*., 833

14  F.3d 1136, 1142 (9th Cir. 2016).  The parties do not dispute that it was proper for the Corps to

15  consult with NMFS, which is in the Commerce Department.  "Consultation results in a

16  Biological Opinion, summarizing the relevant findings and determining whether the proposed

17  action is likely to jeopardize the continued existence of the species."  *Id.* (*internal quotation*

18  *marks and citation omitted*).

19       The NMFS must issue an ITS if the biological opinion "concludes no jeopardy to listed

20  species or adverse modification of critical habitat will result from the proposed action, but the

21  action is likely to result in incidental takings."  *Oregon Nat. Res. Council v. Allen*, 476 F.3d

22  1031, 1036 (9th Cir. 2007).  "Incidental take refers to takings that result from, but are not the

23

24

1  purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or

2  applicant."  50 C.F.R. § 402.02.

3      Under the ESA, "any taking that is in compliance with the terms and conditions specified

4  in [an ITS] shall not be considered to be a prohibited taking of the species concerned."  16

5  U.S.C. § 1536(o)(2).  "[ITS] set forth a 'trigger' that, when reached, results in an unacceptable

6  level of incidental take, invalidating the safe harbor provision.  Ideally, this 'trigger' should be a

7  specific number."  *Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land*

8  *Mgmt*., 273 F.3d 1229, 1249 (9th Cir. 2001).  "In the absence of a specific numerical value,

9  however, [NMFS] must establish that no such numerical value could be practically obtained."

10  *Id.*, at 1250.  "The use of ecological conditions as a surrogate for defining the amount or extent

11  of incidental take is reasonable so long as these conditions are linked to the take of the protected

12  species."  *Id.*  "The terms of an [ITS] do not operate in a vacuum. To the contrary, they are

13  integral parts of the statutory scheme, determining, among other things, when consultation must

14  be reinitiated."  *Id., *at 1251.

15      The Plaintiffs attack the NMFS's failure to set incidental take limits for Southern

16  Resident Killer Whales and the NMFS's use of particular surrogates to determine take limits for

17  other species.  Dkt. 63.  While the Plaintiffs assert in a footnote that the NMFS was required to

18  reinitiate consultation to issue its' Revised ITS, they failed to demonstrate that any of the

19  statutory triggers in 50 C.F.R. § 402.16(a) apply.  No further analysis on that issue is necessary.

20  The Revised ITS will be reviewed here.

21          1.   Take Limits for Southern Resident Killer Whales

22      The Plaintiffs contend that NMFS acted arbitrarily and capriciously when it failed to set a

23  take limit for Southern Resident Killer Whales.  Dkt. 75.  The Corps determined, and the NFMS

24

1    concurred, that the Project was not likely to adversely affect the Southern Resident Killer Whales

2    and the NMFS concurred.  Dkt. 28-4, at 558-559.  Where the NMFS concurs with an agency's

3    conclusion on this question, "no further action is necessary."  50 C.F.R. § 402.13.  The Plaintiffs

4    did not meaningfully challenge the NMFS's determination that the potential adverse effects to

5    the species are "not likely to occur" based on the best available science and so fail to point to

6    issues of fact as to that issue.  ("Under the ESA, the agency must base its actions on evidence

7    supported by 'the best scientific and commercial data available.'" *San Luis,* at 601–02 (*quoting*

8    50 C.F.R. § 402.14(g)(8) and16 U.S.C. § 1536(a)(2)).  The NMFS did not act arbitrarily or

9    capriciously when it did not include take limits for the Southern Resident Killer Whales.  It is

10   entitled to a judgment as a matter of law on that issue.

11                    2.   Surrogates for Take Limits

12          The Plaintiffs contend that NMFS failed to provide valid surrogates for takes of the

13   species identified in the biological opinion that will be adversely affected by the Project:  certain

14   species of salmon, certain species of steelhead, eulachon, and leatherback turtles. Dkt. 63.  The

15   Plaintiffs argue that the take surrogates in the Revised ITS are impermissibly coextensive with

16   the scope of the Project and so do not provide meaningful measures to determine when

17   consultation must be reinitiated.  *Id.*

18          A biological opinion or ITS may use a surrogate "to express the amount or extent of

19   anticipated take provided that the biological opinion or incidental take statement:" (a)

20   "[d]escribes the causal link between the surrogate and take of the listed species, (b) "explains

21   why it is not practical to express the amount or extent of anticipated take or to monitor take-

22   related impacts in terms of individuals of the listed species, and" (c) "sets a clear standard for

23   determining when the level of anticipated take has been exceeded."  50 C.F.R. § 402.14.

24

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT - 18

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

a.  <u>Causal Link</u>

The NMFS adequately described the causal link between the surrogates and the take of the relevant species (certain types salmon, certain types of steelhead, eulachon, and leatherback turtles).  The biological opinion discusses each of these species, describes the Project's impacts on these species, provides the best manner to calculate the likelihood of "takes," and connects the surrogates to those takes.  *See e.g.* Dkt. 28-4, at 524-526 (describing the relevant salmon and steelhead takes by ship wake strandings).  The Revised Incidental Take statement describes the casual link between each species and the surrogate that it identified.  For example, the biological opinion discusses leatherback turtles, ship strikes, describes the causal connection between the number of vessels and leatherback turtle strikes, and contains calculations regarding the likelihood of that any one vessel will encounter a leatherback turtle.  Dkt. 28-4, at 513-514, 538-540, 550-551, and 594-595. The Revised ITS sets the surrogate for leatherback turtles at 72 vessels a year, which is the number of vessels a year expected by the Project.  Dkt. 28-4, at 609-610.  Similar calculations were done for all subject species.  The biological opinion and Revised ITS carefully described the causal link between the surrogates and the take of each of the relevant species.

b.  <u>Specific Numeric Value for Take Not Practical</u>

The NMFS sufficiently established that no numerical value for take of the relevant species could be practically obtained.  The Plaintiffs do not make a showing to the contrary. For example, the Revised ITS explains that "there is no practicable means to monitor for the number of fish taken through increased predation (fish cannot be counted once consumed), elevated sound levels (fish will move in and out of affected area and harm is not necessarily visible), or egg entrainment (miniscule eulachon eggs cannot be practicably distinguished from dredge material)."

Dkt. 28-4 at 609.  The NMFS did not act arbitrarily and capriciously when it did not set a specific numerical value for the take of relevant species.

c.  Clear Standard for Determining when Level of Take has been Exceeded

The NMFS has adequately set a clear standard to determine when the level of anticipated take has been exceeded.  The identified surrogates, with the required monitoring and reporting, establish when re-initiation of consultation with NMFS is required.  For example, the Revised ITS requires monitoring and reporting for when more than 72 vessels per year are used and when more than 8,200 pile strikes per day are exceeded in the construction.  Dkt. 28-4, at 612-613. It requires notification if the relevant portion of the dock is constructed larger than 10,925 feet. Dkt. 28-4, at 613. These are objective criteria for determining when the anticipated take is exceeded and re-initiation of the consultation is required.  Further, the Revised ITS establishes a continuous duty to monitor and report the impacts of the incidental takes, ensuring that relevant triggers remain in place.  *See e.g.* Dkt. 28-4, at 611-613.

The Plaintiffs maintain that the take surrogates are coextensive with the scope of the Project and so are impermissible.  The Plaintiffs cite *Oregon Nat. Res. Council v. Allen*, 476 F.3d 1031, 1036 (9th Cir. 2007) for the that proposition.  The Defendants properly point out that since *Allen* was decided, in 2015, NMFS has interpreted the ESA and regulations to provide that surrogates that are coextensive with a proposed action may be permissible, for example, where monitoring and reporting are required. 80 Fed. Reg. 26,834-26841.  Continuous monitoring and reporting are required for the life of the Project.  NMFS set clear standards to determine when a level of take has been exceeded.

3.  Conclusion on ESA Claim

The Plaintiffs motion for summary judgment on their ESA claims should be denied.  The Defendants and Intervenor Defendants have shown that there are no issues of material fact and they are entitled to a judgment as a matter of law on the Plaintiffs' ESA claims. The Defendants' and Intervenor Defendants' motions for summary judgment on the ESA claim should be granted.

**F.  CONCLUSION**

For the reasons provided above, the Plaintiffs' motion for summary judgment on its ESA claim, pursuant to APA, should be denied and the Defendants' and Intervenor Defendant's motions on that claim granted.  The Plaintiffs' motion for summary judgment on their remaining claims under the APA via NEPA, CWA and RHA, pursuant to APA, should be granted, the permits should be vacated, and the case remanded to the Corps to prepare an EIS and to reassess the public interest in the Project.  The Defendants' and Intervenor Defendant's motions for summary judgment on the Plaintiffs' NEPA, CWA, and RHA claims should be denied.

### III.   <u>ORDER</u>

Therefore, it is hereby **ORDERED** that:

(1) Plaintiffs' Motion for Summary Judgment (Dkt. 63) **IS**

- **DENIED** as to the Plaintiffs' claims under the ESA,

- **GRANTED,** as to their remaining claims;

(2) The Federal Defendants' Cross Motion for Summary Judgment (Dkt. 74), and the Intervenor Defendant Port of Kalama's Cross Motion for Summary Judgment (Dkt. 73) **ARE:**

- **GRANTED** as to the Plaintiffs' claims under the ESA, those claims are dismissed**, and

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT - 21

1         • **DENIED** as to the Plaintiffs' remaining claims under NEPA, the CWA and the

2          RHA.

3     (3) The permits **ARE VACATED**; and

4     (4) This case **IS REMANDED** to the Corps for further proceedings consistent with this

5         opinion.

6        The Clerk is directed to send uncertified copies of this Order to all counsel of record and

7 to any party appearing pro se at said party's last known address.

8        Dated this 23rd day of November, 2020.

9

10        ROBERT J. BRYAN
           United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT - 22